# LANDES et al *vs.* PERKINS.

1. The effect of a confirmation by the board of commissioners for the adjustment of land titles in the territory of Louisiana under the act of congress of March 3, 1807; is to vest the legal title in the claimant or his legal representatives.

2. The Spanish law of abandonment was in force in the territory until the year 1816. Abandonment is a question of fact depending upon the intention of the party at the time of relinquishing possession.

3. The territorial act of Limitations of 17th Dec. 1816 abolished all prescription.

4. When the statute of limitations begins to run no subsequent disability will stop it.

5. In a contest between two alienees under the same alienor, one of them is not estopped from showing an outstanding title adverse to that of his grantor.

6. By the territorial law unconfirmed land titles were subject to sale under execution.

7. The fact that a part of the description set forth in an advertisement for the sale of land under execution is false, will not vitiate the sale if the premises are otherwise certainly described.

8. The title of a *bona fide* purchaser at a sheriff's sale cannot be declared void in a collateral proceeding, on account of any error or irregularity in the judgment or execution.

9. Prior to 1826, the sale of the lands of deceased persons was authorized under executions against their personal representatives.

10. An action of ejectment may be maintained on a confirmation by the board of commissioners for the adjustment of land titles.

## ERROR TO ST. LOUIS COURT OF COMMON PLEAS.

### STATEMENT OF THE CASE.

This was an action of ejectment brought by the plaintiff in error to recover a lot in the city of St. Louis, fronting about 40 feet on Washington Avenue, between 4th and 5th streets. The plaintiff claimed under one Jaeques Clamorgan who died in St. Louis in the year 1814, and to whom there was confirmed on the 13th November 1811, by the board of commissioners for the adjustment of land titles in this territory, under the second section of the act of 3d March 1807, a tract of one by forty arpens situated in the little prairie adjoining the town of St. Louis. The minutes of the board read in evidence by the plaintiffs, recite that Jacques Clamorgan assignee of Ester mulattress, assignee of Joseph Brazeau, assignee of Gabriel Dodier, claiming one by forty arpens situated in the little prairie adjoining the town of St. Louis, produced a concession from St. Ange and Piernas L. G., dated 23d May 1772, a transfer from Gabriel Dodier and Joseph Brazeau to Esther dated 4th Nov. 1793 and from Esther to claimant dated 2d Sept. 1794. The board grant to Jacques Clamorgan forty arpens of land under the provisions of the 2d sec. of the act of congress entitled an act respecting claims to land and passed 3d March 1807 and order that the same be surveyed conformably to metes and bounds contained in the report of a survey made for said Dodier and found in Livre Terrien No. 2 folio 15, survey at the expense of United States. The survey under this confirmation was made in 1826 and is numbered 1278, but it was admitted on the trial that this survey had been returned to the surveyor general's office soon after it was made and had there remained on file, but was not approved by the surveyor general, until the year 1845, shortly before a patent issued, when it was for the first time approved. The plaintiff first read in evidence a patent from the United States issued in the year 1845. Shortly before the commencement of this suit to Jacques Clamorgan or his legal representatives for the tract of one by forty arpens, and then proved that the patent embraced the premises described in the declaration, and that the defendant was in possession of the lot in question at the commencement of the suit, and also the monthly value thereof. The plaintiffs then read in evidence a certified copy of the will of Jacques Clamorgan, by which he devised his whole estate, after payment of several small specified legacies, to his four natural children St. Eutrope, Apoline,

Cyprian and Maximin. The whole to be divided into five equal parts, of which Maximin was to have two parts and each of the others one part. They then read in evidence a certified copy of the last will of Cyprian (who died in 1827) with the probate thereof, by which after several specified devises, none of which embraced the premises in dispute, he devised to his sister Apoline and to her three natural children, Henry, Louis and Louisa, and to the survivors of them as tenants in common, all the interest and estate which the testator had or was entitled to in any lands in the state of Missouri. They then read in evidence a certified copy of the last will and testament of the said Apoline with the probate thereof, by which after some specific devises, not embracing the premises in dispute, she devised to her three children, Henry, Louis, and Louisa, and to any and all other children that might thereafter be born to her, and to the survivors of them, all the interest and estate which the testatrix had or was entitled to in law or equity in any lands or lots lying and being in the state of Missouri. The plaintiffs then read in evidence a deed from the two plaintiffs, Louis and Henry Clamorgan and their wives to their two co-plaintiffs Landes and Sharp, for three undivided fourth parts of all the right, title and interest of the said Henry and Louis in and to the tract of one by forty arpens embraced in the patent. The plaintiffs then proved that Cyprian died in 1826 or '27—that Apoline died in 1829 or '30, leaving four children, Louis, Henry, Louisa and Cyprian. That Louisa died in 1833, aged only 6 or 8 years—that Louis Henry and Cyprian are yet living, and the two former are plaintiffs in this suit. That the said Apoline was never married—that Maximin died about the year 1820, unmarried and without children—that St. Eutrope died many years ago—as the witness supposed some 15 or 20—leaving a wife but no children. The plaintiffs then read in evidence a transcript from the office of U. S. recorder of land titles, purporting to contain a complete transcript of all that appeared of record in that office, relative to the claim of Jacques Clamorgan to the tract of one by forty arpens in dispute; this transcript contained the following documents:

1st. The survey by Duralde the then Governor of this tract and of the adjoining tracts, made in 1772. On the margin of the survey of this tract, is a memorandum signed Trudcan, representing Clamorgan as proprietor and stating that it was originally conceded to Julius Roy and afterwards reunited to the King's domain—then conceded to Gabriel Dodier who afterwards sold it to Clamorgan.

2d. A deed from Dodier to Esther for the tract of one by forty in dispute, dated 4th Nov. 1793, and recorded in recorder's office 29th Nov. 1805.

3d. A deed from Esther to Clamorgan for the same tract dated 2d Sept. 1794, and recorded 10th Dec. 1805.

4th. Clamorgan's claim before the board of commissioners for this tract with a survey and plat of the same accompanying the claim.

5th. The minutes of the board confirming this tract to Clamorgan 13th Nov. 1811.

6th. Certificate of confirmation issued by the board to Clamorgan for this tract 13th Nov. 1811.

7th. Patent Certificate issued by recorder Conway on the above confirmation, 10th February 1845.

The plaintiffs then read in evidence a certified copy of the survey No. 1278, made in 1824, of the tract in question under the confirmation, and proved by the late U. S. recorder of land titles at St. Louis—that the record books A B C D E and F in said office contain the notices and claims to land filed before the commissioners for the adjustment of land titles—that a number of the original notices filed by claimants are yet in the office, but that a large majority of them after being filed and recorded, were withdrawn; whilst the witness held that office, he generally took receipts for them. Has never examined for the original notice of the claim to the tract in controversy. Upon this proof the plaintiffs rested their case; the defendant then introduced the following documents.

1st. The transcript of a record of a suit commenced by Gregorie Sarpy ex'r of Antoine Reilhe dec'd against Jacques Clamorgan, in the general court for the territory of Louisiana in May 1808. The transcript contained 1st, the declaration ; 2d, the summons, which had no endorsement showing that it was ever delivered to the sheriff or was ever executed ; 3d, the judgment which recites as follows, " and now at this day come the parties aforesaid by their attorneys and neither party requiring a jury, but this case with all things relating to the same being submitted to the court for that it appears to the court," &c., proceeding to render judgment against the defendant for $2393 80 and costs, and lastly an execution on this judgment which was returned with only this endorsement upon it, " Received 6th June 1808, satisfied Jer. Conner, sheriff "

2d. A deed from sheriff Conner to Alex. McNair for a tract of one by forty arpens reciting the foregoing execution and that by virtue thereof, the said sheriff did attach all the title of said Clamorgan to a certain piece or parcel of land being one arpen in front, by the depth of forty arpens, situate in the little prairie and adjoining the town of St. Louis and that having advertised the same according to law, he sold the same to said McNair for $180. This deed was dated 8th July 1808, was acknowldged by the sheriff in the court of common pleas for St. Louis district on 9th July 1808 but was not recorded until 13th Oct.

3d. A deed from Alex. McNair to Jeremiah Conner dated 13th day of August 1808 for several tracts of land and amongst others, a tract described as " One arpen by forty, late the property of one Jacques Clamorgan purchased by said McNair at a public or sheriff's sale of the property of said Clamorgan, as by deed bearing date the 8th day of July last." This deed was recorded 21st Feb. 1809.

4th. A transcript of a judgment and proceedings under it in favor of Rufus Easton vs. Soulard & Cabanne ex'rs of Jacques Clamorgan. The suit was an action of debt, commenced by Easton in the circuit court for St. Louis county against the defendants as executors of Clamorgan on the 17th Nov. 1819. The summons was served on the defendants, who pleaded to the action and on 20th April 1820 judgment was rendered for the plaintiff for $131, debt $28 87 damages, besides costs, and that he have his execution against all and singular the goods and chattels, lands and tenements which were of the said Clamorgan at the time of his death in the hands of said executors, to be administered, upon this judgment an execution issued on the 10th June 1820, upon which the sheriff returned that he had made $169 by the sale of a tract of land of 80 arpens, which after paying all the costs and interest left $143 02 to be credited to the debt and damages. On the 3d April 1826 an alias fi fa issued on the judgment, which directs the sheriff that of the goods and chattels, lands and tenements which were of the said Clamorgan at the time of his death in the hands of said executors to be administered, he should cause to be made &c., following the language of the judgment upon which the sheriff returned that to satisfy said execution, he had levied upon the real estate described in his advertisement of sale, a copy of which is appended to and forms a part of his return, and that after duly advertising the same he sold it on 27th July 1826, to John O'Fallon and Jessee D. Lindell, for $33, which sum, after deducting all costs, satisfied the execution and left a surplus in his hands of $5 42. The advertisement accompanying the return describes the land levied upon as a " a certain piece or parcel of land containing one arpen in front by forty arpens in depth, and bounded on the eastern end by a fence formerly made to defend the crops of the inhabitants of St. Louis against the animals or beasts. On the north by the land of Taylor ; (pere) on the western end by the King's domain, or vacant land, and on the south by the highway which leads to the village of St. Charles, it being the same lot of forty arpens acquired by said Clamorgan of Gabriel Dodier, by deed bearing date November 4th, 1793, the boundaries above set forth are the same as given in said deed."

5th. A deed from sheriff Walker to O'Fallon and Lindell, describing the land as it is described in the sheriff's advertisement. This deed was dated 10th August 1826, and was duly acknowledged and recorded.

31

6th. A certificate from the keeper of the parish records of the Catholic church at St. Louis, showing that St. Eutrope was the natural son of Jacques Clamorgan, and a free negress named Helen ; and that he was born on 10th April, 1799; that Apoline was also a natural child of said Clamorgan, and a negress named Susan, and that she was born 7th February, 1803 ; that Cyprian was also a natural child of said Clamorgan, and a negress named Judith, and was born 6th June 1803, and that Maximin was a natural child of said Clamorgan, and was free born, the child of Julia, a mulattress, and was baptized 13th July 1807·

7th. A deed from Joseph Brazean to Eutrope, Apoline and Cyprian, three of the children of Clamorgan, for other property than that in controversy, upon which deed was an endorsement proved to be in the hand writing of Clamorgan, in which he recognizes St. Eutrope, Apoline, Cyprian, and Maximin to be his natural children, and gives the dates of their respective births as above set forth, and enjoines it upon three others to permit Maximin to share the property with them.

8th. A deed from Gabriel Dodier to Esther, mulattress for the tract of 1 X 40 arpens, dated 4th November, 1793, in which deed it is described as a lot of one arpen in front by forty in depth, situated in the rear of this town on the prairie which lies there, bounded on the east by the fence which is placed there to preserve the grain from animals ; on the west by the King's domain ; on the north by a lot formerly appertaining to Mr. Tayon Sr. ; on the south by the royal road which leads to the village of St. Charles and St. Ferdinand ; which road separates the aforesaid land from that which Mr. Masie actually cultivated, which has been acquired from Mr. Francis Bisonet, as appears from the book of Arpentage, for the year 1772, the which aforesaid lot of one arpen has been heretofore sold by the said Gabriel Dodier to Mr. Calver, Sr., and by this last to Mr. Jos. Brazean, who has finally again sold it to the above named Esther, a free mulatto woman who is actually in possession, &c , Brazean and Dodier unite in the deed.

9th. A transfer from Esther on the back of the last mentioned deed of all her right, title and interest in the said tract to Wm. C. Carr, dated 15th June, 1809, the deed last mentioned was duly recorded about the time it bears date.

10th. A transfer or assignment on the back of the same deed from Wm. C. Carr and wife to Jeremiah Conner of all the intetest of said Carr and wife to the said tract, dated 28th April, 1812, and recorded in 1814.

11th. Mesne conveyances from Jeremiah Conner through several intermediate purchasers of the lot for which this suit is brought, down to Joseph Bates, under whose heirs the defendant at the time of the institution of this suit was in possession as a tenant.

12th. A document which was proved to be in the handwriting of Jacque Clamorgan, as also several endorsements thereon which document purported to be a list of lands belonging to Clamorgan at the time it was made, and was endorsed by him " lands which remain to me," in which the tract of 1 X 40 arpens does not appear.

13th. A deed from Jacques Clamorgan to Wm. C. Carr, dated 4th Sept., 1813, for a portion of the lands mentioned in the list or memorandum last above mentioned, and which are marked with letters and figures corresponding with the same tracts on the said list.

14th. An original plat and certificate of survey of the tract of 1 X 40 arpens in dispute, made by Soulard, in the year 1805, with several endorsements thereon, which were proved to be in the handwriting of Clamorgan ; one of which was the following: "Sold at auction." There was also endorsed on said plat the word "ascertained," which was proved to be in the handwriting of Garnier, clerk to the board of commissioners, and the words "recorded Book C, pages 165 & 166," which was in the handwriting of one of the clerks of Donaldson, the former recorder of land titles.

Defendant then proved by Wm. C. Carr, that in 1804, Clamorgan resided in St. Louis, on the same block on which the Missouri Hotel now stands, and continued to reside there until his death. That from 1804 until after witness bought it in 1809, the tract of 1 X 40 in dispute remained

unoccupied. That in 1804 the common field fence was all gone and none of the common field lots were then enclosed. That witness bought the 1 X 40 arpens in dispute of Esther, in 1809, and took possession of it the same year or the year following, by building a fence on the eastern end of it, enclosing an acre or two. The fence enclosed the width of the arpen and went down to where Third street now is. Clamorgan then resided on Main street, about one and a half blocks north of the fence aforesaid. Clamorgan was in town, and at his place when witness made the fence and took possession, and he and witness had a good deal of conversation about it before witness took possession, but had no conversation until after witness bought of Esther. Clamorgan did not object to witness' taking possession. Witness told him he had bought it of Esther; and intended to take possession under his purchase, and accordingly took possession in his own right, under Esther. Witness told Clamorgan that he was going to fence in a lot to put his horse in, and if he had any objection or any claim to set up he had better do it then. Clamorgan replied toot ! toot! take it. I will never disturb you, or something to that effect. Witness then knew of the deed from Esther to Clamorgan for the same tract. Had seen it before he purchased of Esther. Witness knew Esther, who was a mulattress, and at that time free, having been manumitted by Clamorgan. Witness never took possession of any part of the tract otherwise than as above stated, but kept the possession until he sold to Conner in 1812. Conner then took possession and extended the fence westward about to where Seventh street is. The arpen of Francis Prissonet adjoins this on the south. Conner kept his horse and cow in the enclosure, and kept up his enclosure some years; cant say how many. Conner died between 1820 and 1823. Lucas and Christy enclosed their lots in 1807 or 1808. Christy's fence extended from Third street westward to Seventh street. Knows that Conner exercised acts of ownership over the land in dispute for some years after he bought it, and thinks he continued to do so until his death. Conner in his lifetime laid off blocks and streets upon the ground. Clamorgan had been a merchant and trader here, and went to Santa Fe; witness thinks in latter part of 1809, but not positive as to time, and was gone a year or two. The witness also proved other conversations with Clamorgan tending to show that Clamorgan had fraudulently procured deeds from Esther for sundry tracts of land and amongst others the land in dispute. That Esther had conveyed some of these lands to witness and witness afterwards sold and conveyed a part of them (not the land in controversy) back to Clamorgan. Witness was not the agent of Esther to procure confirmations to her lands, and could not have been as he was then U. S. attorney, having been appointed such in 1805 and continued such until the board was dissolved in 1811. Witness never presented this claim for confirmation, nor any that he got from Esther, but presumes they were presented in the name of Clamorgan and that he witness knew that part. Esther was reputed to be Clamorgan's concubine. Witness thinks before he took the deed from Esther, he had seen her deed to Clamorgan of record, in 1813 witness and Gov. Clark purchased a large quantity of land of Clamorgan; does not recollect of any unsatisfied judgment at that time against Clamorgan; thinks if there had been he would have known it.

The defendant also introduced other evidence tending to show that Conner from the time of his purchase of Carr, took possession of the eastern end of the tract, extended the enclosure made by Carr, out westward near to where Seventh street now is, which enclosure continued until Conner concluded to lay off the eastern end of the tract into town lots, which was about 1818, or 1819. That about this time he took down the fence, laid off the ground into lots and blocks, laid out Washington Avenue, a street running along the south edge of the tract designating the blocks by stakes or stones. That about the same time, &c., sold several lots which were soon after enclosed and occupied and have ever since been in the possession of those claiming under him. That up to the time of his death he claimed to own such parts of the tract as he had not sold. It was also proved that in 1812 Conner had offered to take $800 for the tract in dispute, but that it afterwards rose rapidly in value, and about 1812 Conner was offered $80,000 for it by some one from Cincinnati, but refused it.

This rise was at its hight in 1820, after which property depreciated as rapidly as it had risen,

and for several years there were great sacrifices of property. Large quantities sold at forced sales, and as there was very little money in the country, it generally went greatly below its value. In 1826 it had begun to improve again, and property was looking up.

One witness (Wash) thinks that in 1826, if the title to this 1 X 40 arpens had been free from dispute it would have sold for at least $10,000. But thinks that Clamorgan's title to it would have brought little or nothing.

The defendant also introduced evidence tending to prove that the common field fence which bounded the tract in dispute on the eastern end, was taken down before the change of government That whilst this fence was standing there was a gate in it about opposite the centre of what is now Washington Avenue, through which passed a road leading to St. Charles, and that was the road usually traveled. That this road ran along the south edge of the tract in dispute until it reached about opposite or a little beyond where the college now is, and then diverged to the right and crossed over in the direction of judge Carr's—this was called King's road, as were all large public roads. It was also proved that Clamorgan left here prior to 1808, on a trading expedition to Santa Fe and was absent two or three years. Did not return until the winter of 1808 or the spring of 1809.

Pierre Chouteau Jr., testified that whilst Clamorgan was absent at Santa Fe, Peter Chouteau, Sr., the father of witness, purchased a judgment in favor of Mildrum and Parks vs. Clamorgan, to prevent a sacrifice of Clamorgan's property—that after purchasing the judgment, he caused a large quantity of Clamorgan's lands to be sold under it and purchased them in and after Clamorgan's return. The said Peter Chouteau, Sr., permitted him to redeem them from time to time as he could command the means.

The defendant then read eight documents, deeds, surveys, &c., of lands, all marked and numbered in Clamorgan's handwriting, and relating to lands mentioned in his memorandum or list of lands given in evidence by defendant, and tending to support the same as an authentic record of the real property of Clamorgan some time before his death, and of his disposition of the same. The defendant then read seven deeds from Conner to Cisgrave and others, conveying to them several certain lots, some of which were on the 1 X 40 arpens in dispute, and others on the tract next adjoining it on the south, which was also claimed by Conner. These deeds bear date from 1820 to 1823. Also a certificate from the keeper of the parish register, showing that Conner was buried on the 20th day of Sept., 1823.

The plaintiff then read in evidence three deeds of emancipation from Clamorgan to his four children, St. Eutrope, Apoline, Cyprian and Maximin, which was proved to be in the handwriting of Clamorgan, and bears date 16th Sept., 1809. Also certificates from the keeper of the parish records of the catholic church at St. Louis, showing that Louis Clamorgan, one of the plaintiff's, was born on 25th July, 1820. That Henry Clamorgan, another of the plaintiffs was born on the 8th day of July, 1822, and that Cyprian, son of Apoline, was born on 27th April, 1830.

Plaintiffs then introduced evidence tending to prove that upon a diligent examination of the Spanish archives, and of the records of St. Louis, no deed could be found of record from Gabriel Dodier to Jacque Clamorgan nor any reference to such a deed.

The plaintiff then moved the court for the following instructions to the jury, which were given,

1st. The Spanish law of prescription as affecting lands, did not exist in the Missouri territory after the taking effect of the act of the general assembly of the territory of Missouri, on the 17th day of December, 1818, entitled an act for the limitation of actions to be brought for the inheritance or possession of real property.

2d. If the jury find from the evidence that the defendant and those under whom he claims had not ten years possession of the premises prior to the 17th Dec., 1818, then said defendant has no title by prescription.

3d. That the execution in favor of Rufus Easton against the executors of Jacques Clamorgan,

LANDES et al vs. PERKINS.

dated the 3d day of April, 1826, and read in evidence by the defendant, and all the proceedings of the sheriff under and by virtue of the said execution, are null and void.

4th. If the jury find from the evidence that the boundaries described in the deed from John K. Walker, sheriff to O'Fallon and Lindell were not at the time of the sale the true boundaries of the lot intended to be described, and that the same had not been bounded in the manner therein described for a period of more than 20 years, and that the deed referred to in the said description, as the one from which it was taken had no existence in fact, then the said description is insufficient, and the deed void unless the jury find from the evidence that the land was generally known in the community at the date of said sale by the description given in said deed.

5th. That if the jury find from the evidence that the defendant claims title under John O'Fallon, and that said O'Fallon accepted a deed on the 10th day of May, 1826, intended to convey the title which Jacques Clamorgan had at the time of his sale in the lot in question, then the defendant cannot avail himself of the statute of limitations in bar of this action.

The plaintiff then moved for the following, which were refused:

1st. If the jury shall believe from the testimony that the patent read in evidence by the plaintiffs embraces the premises in the declaration mentioned, or any part thereof, and that the said patent was fairly obtained without fraud or covin, and further that Jacques Clamorgan, the patentee, had died before the patent issued, having first duly made and published his last will and testament in writing, by which he devised the said premises to his four children, St. Eutrope, Cyprian, Martial, Apoline and Maximin. That the said St. Eutrope and Maximin afterwards and in the lifetime of the said Cyprian, Martial and Apoline, died intestate and without issue: that afterwards and before the commencement of this suit, the said Cyprian Martial died, having first duly made and published his last will and testament in writing, by which he devised the said premises or any part thereof to the plaintiffs, Louis and Henry Clamorgan. That afterwards and before the commencement of this suit, the said Apoline died, having first duly made and published her last will and testament in writing, by which she devised the said premises or any part thereof to the said plaintiffs, Louis and Henry Clamorgan; and that afterwards and before the commencement of this suit, the said Louis and Henry Clamorgan, by their deed in writing, proved and recorded according to law, conveyed an undivided portion of their interest in said premises to the plaint iffs, Landes and Sharp, then the legal title to such undivided portion of the said premises as is embraced in the said patent, and in the devises from the said Cyprian Martial and Apoline, to the said Louis and Henry, is in the plaintiffs.

2d. That if the patent read in evidence by the plaintiffs was fairly obtained, without fraud or covin, and embraces the premises in the declaration mentioned, or any part thereof, the legal effect of said patent was to vest the legal title to the premises therein mentioned, in Jacques Clamorgan, the patentee, if living at the date of the patent, and if not living then, in his heirs, devisees or assignees, in the same manner as if the patent had issued to said Jacques Clamorgan during life.

3d. That if the confirmation to Jacques Clamorgan, bearing date 13th November, 1811, and the survey made by virtue thereof, bearing date October 4th, 1826, embrace the premises in the declaration mentioned, or any part thereof, and if the patent read in evidence by the plaintiffs embrace the same premises, then the legal effect of the said confirmation, survey and patent, was to vest the legal title to said premises in the said Jacques Clamorgan, if living at the date of the patent, and if not living, then in his heirs, devisees or assignees.

4th. That prior to the confirmation read in evidence by the plaintiffs, the legal title to the premises embraced in said confirmation, was in the government of the United States, and that the confirmation, survey and patent, read in evidence by the plaintiffs, if obtained without fraud or covin, were effectual to vest the legal title to said premises in the said Jacques Clamorgan, his heirs, devisees, or assignees.

5th. That the defendant has shown in proof no valid title by prescription to the premises in dispute, either in Esther or any one claiming under her.

6th. That the judgment read in evidence by the defendant in favor of————Sarpy for the use of Mildrum and Parks against Jacques Clamorgan, was null and void, and the sale made by the sheriff by virtue of the execution issued thereon, and the deed from said sheriff to Alex. McNair, is also null and void.

7th. That the deed from the sheriff to Alex. McNair, dated 8th July 1808, and read in evidence by the defendant, is void for uncertainty, and should be disregarded by the jury.

8th. That the deed from the sheriff to Alex. McNair, dated 8th July 1808, and read in evidence by defendant, is void as to plaintiffs Sharp and Landes, unless they had notice of said deed at the date of the deed from Louis and Henry Clamorgan to said Sharp and Landes, as read in evidence by the plaintiffs.

9th. That if prior to the conveyance from Esther to William C. Carr, the said Esther had conveyed the said premises to Jacques Clamorgan, and the said Carr had notice of that fact at the date of the conveyance from Esther to him ; then the said Carr took the possession in bad faith, and by virtue of such possession acquired no title by prescription to the said premises.

10th. That if the said Jacques Clamorgan gave a notice in writing to the board of commissioners for the adjustment of land titles, as required by the acts of Congress of 2d March, 1805, and 3d March, 1807, of his claims to the premises in controversy, in that event during the pending of said claim before the said board, prescription did not run against him.

11th. That if before and at the time the said William C. Carr took possession of said premises, the said Jacques Clamorgan had delivered to the board of commissioners a notice in writing of his claim to said premises as required by the acts of Congress of 2d March 1805, and 3d March 1807 ; and if said claim was pending before said board at the time that Esther conveyed the said premises to said Carr, and if said Carr had notice of that fact, then he received the possession in bad faith, and such possession did not support his prescription.

12th. That if the said Carr, as the attorney for Mildrum and Parks, had obtained a judgment in their favor against Jacque Clamorgan, by virtue of an execution upon which judgment the premises in controversy had been levied upon and sold by the sheriff to Alex. McNair, and by virtue of said sale conveyed by said sheriff to said McNair, before the said premises were conveyed by Esther to said Carr ; and if the said Carr had notice of these facts, then he acquired the possession in bad faith.

13th. That the sale made by John K. Walker, sheriff, to Jesse G. Lindell and John O'Fallon, on the 27th July 1826, and the deed made in pursuance of said sale, bearing date the 27th July 1826, as read in evidence by the defendant, are fraudulent and void.

14th, That if at the date of the levy and sale by sheriff Walker, and by virtue of the execution in favor of Rufus Easton, against Jacques Clamorgan's executors, dated 3d April 1826, of the premises levied upon, if the said premises, or a considerable portion thereof, then constituted a part of the city of St. Louis, and had been laid off into blocks and squares, separated by streets and alleys, and distinctly marked out by stones set up at the corners or other visible boundaries, and if some of said lots or blocks had before then been sold and conveyed by Jeremiah Conner, claiming to be the proprietor thereof, and if upon the said lots or blocks so sold as aforesaid, buildings and other improvements had before then been erected by the purchasers, then the said levy and sale made by sheriff Walker to John O'Fallon and Jesse G. Lindell, were null and void.

15th. That if the premises levied upon by sheriff Walker by virtue of the execution in favor of Rufus Easton, against Jacques Clamorgan's executors, dated 3d April 1826, and sold by said sheriff by virtue of said execution and levy to John O'Fallon and Jesse G. Lindell, on the 27th July 1826, for thirty-three dollars, were at the time of said levy and sale susceptible of division without injury to the property, and were at the date of said levy and sale worth at least ten thousand dollars, then the said sale is fraudulent and void in law.

16th. That if sheriff Walker, by virtue of the execution in favor of Rufus Easton, against Jacques Clamorgan's executors, dated 3d April 1826, levied upon the tract of land containing

one arpen front by forty arpens in depth, of which the lot in controversy in this suit is a part, it was the duty of said sheriff in the said levy, or in his advertisement of the land for sale, to have described the same with reasonable certainty, and if he did not so describe it, either in the levy or advertisement, the said sale is void, and conferred no title on the purchasers.

17th. That if sheriff Walker, by virtue of said execution, dated 3d April 1826, in favor of Rufus Easton vs. Jacque Clamorgan's executors, levied upon only one tract of land containing one arpen in front by forty in depth, and in advertising the same for sale ; described the boundaries thereof in such manner that the boundaries given in said advertisement embraced two tracts, each having one arpen front by forty deep, thereby leaving it uncertain from his advertisement which of the two tracts he had levied upon : the sale made by said sheriff under said advertisement of either of said tracts is void in law.

18th. That if on the 17th day of December, 1818, Cyprian, Martial and Apoline Clamorgan, (the devisors of the plaintiffs Louis and Henry Clamorgan) were lawfully entitled to the possession of the premises in controversy, or any part thereof, and if the said Cyprian, Martial and Apoline were then under the ages of twenty-one years, they were allowed by law the period of twenty years, after they should respectively have become of the age of twenty-one years, within which to prosecute suit for the same ; and if within the said period of twenty years last above mentioned, the said Cyprian, Martial and Apoline died, having first duly published their last wills and testaments in writing, by which they respectively devised the premises in controversy to the plaintiffs Louis and Henry Clamorgan, and if at the time of the taking effect of the said devises, the said Louis and Henry were infants, under the age of twenty-one years, then during the minority of the said Louis and Henry the statute of limitation did not run against them.

19th. Previous to the date of the confirmation of to Jacques Clamorgan, on the 13th day of November, 1811, given in evidence by the plaintiffs, the legal title to the premises therein described, was in the governments of Spain, France, and the United States, and there could not have been legal prescription against either of said governments.

20th. The defendant in this suit cannot avail himself of any possession of the land described in the confirmation given in evidence by the plaintiffs as adverse to the sheriff's claim prior to the date of the deed from sheriff Walker to O'Fallon and Lindell, that is to say, prior to the 10th day of August 1826.

21st. The defendant in this action cannot avail himself of any possession of the premises in dispute as a bar to the plaintiffs recovering in this suit, except after the date of the deed from sheriff Walker to O'Fallon and Lindell, that is to say, after the 10th day of August 1826.

22d. No action could have been had or maintained by Clamorgan, nor by any person claiming under him for the recovery of the possession of the premises in question, prior to the survey and setting apart of the same, under the said confirmation by the United States surveyor in 1826, and until such survey, time did not run under the statute of limitations against those claiming under said confirmation, and can be calculated only from the time of such survey.

23d. No adverse possession prior to the statute of limitations in 1818, not having matured into a presumed grant, by reason of thirty years prior consecutive possession can avail after said statute against a right of action then existing.

24th. Clamorgan had no estate in the tract in controversy, at the time of the sheriff's sale of sheriff Conner, to McNair, which could be sold under an execution.

25th. The judgment in the suit of Sarpy against Clamorgan is void, if the jury believe from the evidence that Clamorgan was not served with process in said suit, nor authorized any appearance thereto for him, and this the defendant is bound to show, unless the record of the case shows a service.

26th. Before the confirmation no right, title, or estate, in this tract existed out of the United States, saleable either at private or sheriff's sale, that could be enforced at law.

27th. To make a title by prescription, the possession must be begun with an honest and sincere belief of right to the property, the possession must be uninterrupted, and under a claim of title ; a discovery by the person purchasing of any defect of title during the running of the time necessary for making a title by prescription, vitiates it even in the hands of a third person, bona fide, and for a valuable consideration.

28th. To make the acts, words or conduct of a person evidence against his rights, by way of disclaimer, assent or abandonment, it should satisfactorily appear that at the time of such acts, words or conduct, he was well aware of his rights, was free to do and say as he pleased, was under no improper restraint or influence, and was aware of the effect of such acts, words or conduct, and that they were free and voluntary.

The defendant then moved the following, which were given :

1st. If the jury find from the evidence that the lot in dispute is embraced in the tract of land sold by the sheriff, Connor, to Alexander McNair, in 1808, as the property of Jacques Clamorgan, then the confirmation to Clamorgan enures to the purchaser at that sale, and those claiming under him, and the plaintiff cannot recover.

2d. If Jacques Clamorgan in his lifetime abandoned the tract of 1 by 40 arpens, mentioned in the confirmation of the board of commissioners of 13th Nov., 1811, and the said Conner took and held possession thereof afterwards, claiming to own it, then all of Clamorgan's title therein at the time of said abandonment, was divested out of him.

3d. The Spanish law was in force on the subject of abandonment till after the year 1814, in this country, and that abandonment according to that law, was a relinquishment of the possession thereof by the owners, with the intent that it should never be any longer his.

The plaintiffs excepted to the opinion of the court in refusing the instructions moved by them and in allowing those given on belief of the defendant, and the defendant excepted to the opinion of the court in giving the instructions allowed on behalf of the plaintiffs and refusing those asked by defendant, and which were disallowed by the court. After the verdict the plaintiffs filed a motion for a new trial assigning the usual reasons, and the refusal of the court to give the instructions asked for by the plaintiffs, which were disallowed, and the giving of the instructions allowed on behalf of the defendant. The court overruled the motion for a new trial, to which the plaintiffs excepted and have brought the case to this court by writ of error, assigning as error:

1st. The refusal of the court to grant the plaintiffs a new trial.

2d. The refusal of the court to give the instructions asked for by the plaintiffs and which were disallowed.

3d. The giving of the instructions on behalf of defendants.

4th. The admission of incompetent evidence on behalf of defendant.

## CROCKETT & BRIGGS for plaintiffs in error.

1st. That before the confirmation and patent, the *legal* title to the premises in dispute was in the United States, and the effect of the confirmation and patent was to vest the *legal* title in Clamorgan, his heirs, devisees, or assignees, and the confirmation and patent pre suppose the existence of all the facts necessary to their validity.

Polk's lessee vs. Wendell 9 Cranch 98 ; Masters vs. Eastis 3 Port (al) R. 372, Jackson Ex dem. Mancius vs. Lawton 10 John 23; Polk's lessee vs. Wendell 5 Wheat 293.

2d. That the confirmation to Clamorgan on the 13th Nov, 1811, is conclusive as against all persons whomsoever. That at the date of said confirmation the title was in said Clamorgan and no title can avail the defendant in this action which he or those under whom he claims, acquired

prior to the confirmation, and whether the same were an adverse title to that under which Clamorgan claimed or was derived under him by sheriff's deed is immaterial,

Strother vs. Lucas 12 Peters 458; Mackay v,. Dillon 7 Mo. R. 13; Newman vs. Lawless 6 Mo. R. 279, 297; United States vs. King 3 Howard 787.

3d. That the title being in Clamorgan by the confirmation, it did not have relation back to the inception of the title in such manner as to vest in McNair, the purchaser at the sheriff's sale in 1808, the *legal* title acquired by Clamorgan under the confirmation. Because,

1st. The confirmation is to Clamorgan in terms, in his own individual right and enures to his sole use and cannot be construed as a confirmation to the use of whosoever might hold the better equity. See authorities last cited.

2d. The sheriff's deed to McNair was without covenants of warranty or seizin, and was in terms only a conveyance of such right, title and interest as Clamorgan then had in the premises In such case, the title afterwards acquired by Clamorgan under the confirmation, did not enure to the benefit of McNair, the purchaser at the sheriff's sale. Masters vs. Eustis 3 Port (Al) R. 368 Evans vs. Labbadie 20 Mo. R. 429; Newman vs. Lawless 6 Mo. R. 290! Le Bois vs. Brummel 4 Howard 462; 14 John 193; 13 John R. 463; 3 Litt R. 472; 12 Pick. R. 47; 13 Pick R. 116.

4th. That the sheriff's deed to McNair in 1808 is void for the following reasons. Because :

1st. There was no service of process or appearance on the part of Clamorgan in the suit of Sarpy Exr of Reihle vs. Clamorgan. Sanders H. vs. Jennings 2 Dana 37; Bascom vs. Young 7 Mo. R. 1; Smith vs. Ross & Strong 7 Mo. R. 463.

2d. There was no sufficient description of the premises in the levy advertisement or deed, and the deed is therefore void for uncertainty. Evans vs. Ashley 8 Mo. R. 177; Rector vs. Hart 7 Mo, R. 534; 2 J. J. Marsh 33; Rector vs. Hart 8 Mo. R 448.

3d. Clamorgan at the date of said levy and sale had no title in the premises which could be sold under execution and enforced at law.

5th. That the deed to McNair of 1808 is void as to the plaintiffs Landes and Sharp, because it was not recorded until after they acquired title, and after the commencement of this suit. 1 Edwards Comp. p. 47, Sec 8. Nor is it material under the law governing the deed of 1808, whether Landes and Sharp had notice of it or not. It was *void* against subsequent purchasers for value, whether with or without notice. But in this case there is no evidence of notice to Landes and Sharp, unless it can be inferred from adverse possession. In this State, such notice will not be inferred from adverse possession, but *actual notice* must be proved. Frothingham vs. Stacker, 11 Mo. R.

6th. That the defendant, or those under whom he claims, have no title under the Spanish law of prescription, because

1st. The law of prescription did not prevail in this territory when Carr, under whom defendant claims first took possession.

2d. If it did then prevail it was abrogated by the introduction of the common law in 1816.

3d. If not sooner abrogated, it was clearly abolished by the statute of limitations of 1818, at the time of the passage of which act, Carr and those claiming under him had not a title by prescription, having then been in possession less than ten years. 1 Territorial Laws, 598.

4th. If the prescription were otherwise valid, it was void in this case, for the reason that Carr took possession in bad faith, having taken the title from Esther with a knowledge of Clamorgan's title, and that his claim for confirmation was then pending before the board of commissioners, and the court below erred in refusing to allow the jury to pass upon the question of bad faith in Carr ; the jury were entitled to decide upon Carr's credibility as to the circumstances under which he took possession. But the court refused to instruct the jury that his possession must have began with an honest and sincere belief of right to the property, &c. (See instructions marked 39 and 16, 18, 19, statement of case.) In this the court erred.

5th. The confirmation to Clamorgan is conclusive against any title by prescription prior to that time, and after the confirmation there was not a space of ten years within which the

32

prescription could be consummate, until it was arrested by the introduction of the common law in 1816, or the statute of limitation of 1818.

7th. That Carr, or those claiming under him, acquired no title by the Spanish law of abandonment, because

1st. That law was not in force in the territory when Carr took possession. 1 Territorial Laws 47, Sec. 8.

2d If there was any abandonment by Clamorgan in the sense contemplated by the laws of Spain, it was *before* the confirmation ; and the title acquired by such abandonment is concluded by the confirmation.

3d. There was evidence tending to show that if Clamorgan did abandon as proved by Carr, he did it, under the mistaken belief that he had already lost the title by the sheriff's sale to McNair, and under the influence of threats, used by Carr as to Clamorgan's transactions with Esther, and therefore the court erred in refusing the instruction asked for by the plaintiff on that subject. (See instruction No. 40 in statement of case.)

8th. That O'Fallon and Lindell, and those claiming under them, acquired no title under the deed of 1826 from sheriff Walker, because

1st. The judgment in the case of Easton vs. Clamorgan's executor, was irregular and void.

2d. At the date of the execution by virtue of which the said sale was made, no execution could lawfully issue against the estate of deceased persons , such execution would necessarily defeat the classification of demands against the estates of deceased persons, as then established by law. Revised code of 1825, page 112 Sec. 50.

And thus nothwithstanding that the act of 1825 last referred to, (sec. 49) provides that no execution shall be issued against executors or administrators until eighteen months after the grant of letters &c. ; section 50 is repugnant to section 49, and they cannot stand together. Section 50 must prevail against the other, because it comes after it, and because one of the objects of the entire act was to classify demands, which would be utterly defeated by allowing the assets to be sold on execution ; such was the construction of the succeeding legislature which repealed the clause allowing executions vs. executors and administrators. 2 Territorial Laws 103.

3d. The said execution was void because it was generally against the goods and chattles, lands, tenements, whereas it should have directed the sheriff first to levy of the goods and chattles. and for want of sufficient goods and chattles, then of the lands and tenements. Revised code of 1825, 363 Sec 2 Garithy's lessee vs. Ewing, 3 Howard 707 ; 1 Blackford R. 210.

4th. The said deed was void for uncertainty. It contained no sufficient description of the premises, and that which it did contain was utterly erroneous. It professed to describe them not as they existed at the time of the sale, but as they had existed more than twenty years before, and that too by reference to a deed from Dodier to Clamorgan, when in fact no such deed existed. Evans vs. Ashley, 8 Mo. R. 177 ; Rector vs. Hart, 7 Mo. R. 534 ; 1 Har. and J. 449.

5th. The said deed was void because the said premises had before the levy and sale been laid off into streets lots and blocks, distinctly marked by stones and other visible monuments, and should have been so described in the levy and advertisement, whereas in the said levy and advertisement it was described only as a tract of one by forty arpens, without any reference whatever to the fact that it had been laid out into lots, blocks and streets, and then constituted a part of the city of St. Louis Evans vs. Ashley, 8 Mo. R. 177.

6th. The said premises were susceptible of division, and at the date of the sale were worth at least ten thousand dollars. The sale by sheriff Walker to O'Fallon and Lindell of the same premises for thirty-three dollars, was upon its face fraudulent and void Tiernan vs. Wilson, 6 John C. R. 416 ; 4 Cranch 403 ; 18 John R 362 ; 3 Blackford R. 376 ; 6 Wend 522.

9th. That O'Fallon and Lindell, and those claiming under them, cannot avail themselves of any possession of the premises in controversy as adverse to the plaintiffs claim, prior to

the date of the deed from sheriff Walker to said O'Fallon and Lindell in August 1826, because by accepting such deed they are estopped to deny that prior thereto, the title was in Clamorgan or his representatives. Jackson ex. dem. Siresabaugh vs. Sears, 10 John 435 ; Fitch vs. Baldwin, 17 John 161.; Jackson vs. Ireland, 3 Wend 99.; Jackson vs. Hyers, 14 John 224, and cases there cited ; Jackson vs. Britton, 4 Wend 507.

10th. That the statute of limitations cannot avail the defendants in this court, because

1st. That ground of defence was excluded from the jury by the court below, and consequently the jury the jury did not pass upon it.

2d. There is no proof of actual uninterrupted adverse possession on the part of the defendant and those under whom he claims for twenty years next before the commencement of this suit.

3d. Cyprian and Apoline, under whom the plaintiffs claim, were infants at the date of the passage of the statute of limitations of 1818, and having died within less than twenty years after that period, leaving the plaintiffs Louis and Henry their devisees, and the said Louis and Henry being then infants, they are within the proviso of the said statute. 1 Territorial Laws 598.

11th. That although under the statutes of this State an action of ejectment may be maintained upon an equitable title, yet such title cannot prevail against the legal title ; that in this case the patent and confirmation, vests the legal title in Clamorgan, his devisees or assignees ; that the defendant, or those under whom he claims, are not in a legal sense the assignees of Clamorgan, because

1st. The confirmation is conclusive that at the date thereof the title was in Clamorgan, and consequently the sheriff's deed of 1808 is concluded by it.

2d. The title derived by O'Fallon and Lindell under the sheriff's deed of 1826, is void therefore the defendant or those under whom he claims, not being the assignees of Clamorgan, the confirmation and patent vested the *legal* title in Clamargan or his devisees ; and in this action the legal title must prevail against all equities. Chouteau vs. Eckert, 2 Howard 375.; Hickey's lessee, vs. Stewart 3 How 750 ; United States vs. King and Howard, 787 ; Le Rois vs. Brammell 4 How, 449.

12th. That a grant from the government to a deceased person, before the act of Congress of 1836, was void, and conveyed no title to the heirs or other legal representatives ; therefore, if Clamorgan had died, pending his claim before the board, and before confirmation, not having alienated the land, the confirmation would have been void, and his heirs would have acquired no title, nor can the vendee, without warranty, acquiring title pending the claim, and before confirmation, stand in any better condition than the heirs of the confirmee would have done if he had died before confirmation and without having alienated the land. Lewis vs. McGee, 1 A. K. Marsh 199.; Bowman vs. Bartlett, 3 A. K. Marsh 86.; Cooke R. 134.

SPALDING, for defendant.

1st. The first instruction asked by plaintiff below and refused, was erroneous, and rightly refused for the following reason, viz :

1st. Because the title did not pass by the patent, but by the confirmation by the board, and the patent was only the evidence thereof. 5 U. S Statutes 31, act giving effect to patents in name of deceased persons, which explains the meaning of the confirmation to Clamorgan to be in favor of his assignees. 3 U. S. Statutes, 440, act of 3d March, 1807. Under the 2d second section of this act. the present claim was confirmed, and the 4th section declares *the decision of the commissioners final,* when in favor of the claimant. 9 Mo. R. 326, Harold et al vs. Simmons et al, that a confirmation by the act of 3d March 1807, or rather by the commissioners under it, passes the legal title. 6 Peters' Rep. 771, Strother vs. Lucas ;

12 Peters Rep. 453, 4 same vs. same. The confirmation by act of 13 June, 1812, gave complete title; a confirmation by a law is a good grant of title. 2 Howard's Rep. 319, Grigon's lessee vs. Astor. The title to land becomes a legal one when confirmed by Congress. (See 3d U. S. Stat. 724, for the act which requires a patent to issue, in 3d section though the title had passed as court holds.) Cottle vs. Snyder, 10 Mo. Rep., confirming decisions of Harold et al vs. Simonds et al.

2d. And the title which passed by the confirmation by the board on 3d Nov., 1811, *enured to the benefit of Connor as assignee* of McNair, by deed of 3d August, 1808, recorded 21st February, 1809, who was assignee of Clamorgan by sheriff's deed dated 8th July, 1808, under judgment and execution of Reilhes ex'rs vs. Jacques Clamorgan    At the time of the *sheriff's* sale to McNair, the time had expired for filing claims for confirmation. Act of 3d March 1807, Sec. 5. So that the assignee of Clamorgan could not present *his claim* for confirmation, and the only possible mode of perfecting the title was to let it stand on the notice and documents as filed by Clamorgan.

3d. The judgment of Executor of Reilhe vs. Clamorgan in 1808, May 16th was not void; but whether erroneous or not, was sufficient to uphold the sale under it. It is attempted to be impeached on the ground that no writ was served on Clamorgan the defendant; that therefore he was no party to it, and it is void.

1st. The record itself shows that he was a party by voluntary appearance. The correct doctrine is, that if the record shows that *the defendant was served with process*, or that he *appeared personally or by attorney*, it is sufficient; and it is not necessary that there shall be a *formal entry that he appeared*. It is enough, if the judgment be rendered against him, and if the record state that he *previously acted* in the case *personally or* by attorney. 7 Miss. Rep. 426, Day vs. Kerr; 6 Miss. Rep. 50, Griffin et al vs. Samuels; 4 Miss. Rep. 228, Lindell vs. Bank.

4th. There was no irregularity in the execution and sale sufficient to make the sale void. 10 Peters 472; Vorhees vs. Bank 2 Homan Rep. 319; Greguon's lessee vs. Astor, as to general principles 2 Ten. Rep. 44; 4 Dana 439; 5 John Rep, 89; 4 Wend. 462, 474.

5th. There was a sufficient description in the sheriff's deed to McNair. 4 Den. & Bat. 414. 1 Humphrey 80; 3 Yerger 371; 7 Yerger 490; 8 Gill and John 345; 2 N. Hamp. 284.

6th. The failure to record the sheriff's deed to McNair till 1846 does not affect the title of Conner and his representatives, the present occupants of the land in question.

1. Because the confirmation was a grant by the United States, and vested the title in Conner, assignee of Clamorgan, and the local law could not control the effect of the confirmation.

2. Because the law did not require the sheriff's deed to be recorded, nor impose any forfeiture for failure to record it. 1 Edwards Com. 46-47, sec. 8, passed in 1804. This does not include sheriff's deeds, as there could be none at that date, as the first authority for such deeds was in 1807, and the words of that section evidently do not contemplate such deeds, and this was the first act requiring deeds to be recorded, and was enacted in October, 1804. 1 Edwards Com. 120; 1 sec. 45-46-47 & 48. This act went into operation 1st Sept., 1807, and provides for sheriff's deeds, and for acknowledgment of the same in court in the county where the lands sold lie, and for an entry of record in the court of the acknowledgment of the deed containing a description of the lands. This was the only recording of a sheriff's deed then required.

1 Edwards Com. 543, in force 1st April, 1818. This act provides that all deeds, conveyances and other obligations for lands *thereafter* made, &c., should be recorded in three months. This has no reference to deeds already made.

1 Edwards 798, act in force 1st March, 1822, provides form of acknowledgment and proof of deeds and declares that deeds shall be valid only between parties and their heirs *unless so acknowledged or proved and recorded.* This is prospective, and does not affect past deeds.

6th. Plaintiffs instructions (Nos. 4, 8, 9, 10, 11, 18, 25,) relating *to prescription*, were refused correctly. No. 4 takes the whole matter from the jury, and substantially asserts that there is *no*

*evidence* of prescription in Esther or any one claiming under her. The court had already given for plaintiffs the *first* and *third* instructions asked by them, substantially declaring there could be no prescription later than 17th Dec., 1818, and that the time for it must reach back ten years beyond that to be a bar, which would bring its commencement to 17th Dec., 1808. Now there was evidence of prescription.

1st. In favor of Esther from the date of the deed to her by Dodier, 4th Nov., 1793, which states that she was *then actually* in possession. 1 Partidas 369 and following also 394; 12 Peters Rep. 456, 462 & 461. 4 Frebero 470 No. 215, No. 471, No. 218, 5 Ditto 126, No. 145; 2 Partidas 1158 law 9; 5 Mis. Rep. 310. The Spanish law accompanies the deed, as in fact it did as stated in this case, and that when possession is once had it always in law continues, till actual relinquishment of it, and that it is presumed in law to continue and that such possession, that is, *constructive*, not *actual* is all that is necessary in prescription.

8th. The 12, 13, 14, 15 and 16th instructions of plaintiffs (refused) relate to the sheriff's sale and deed, &c., under judgment of Easton vs. Clamorgan's executors which was made in 1826. All these instructions were superseded and useless (if legal) as the court instructed the jury in the second of the plaintiffs instructions which were given, that the execution in that case on which the sale was made, and the sale itself and all proceedings thereunder were null and void. Having given this instruction, it was not the duty of the judge to repeat the same thing by instalments.

9th. The first and second instructions given for defendant, defined abandonment and submit the question of fact to the jury. The 26th instruction of the plaintiffs refused by the court.

The first and second of defendant's instructions are based upon the Spanish law. 1 Partidas 365 law 49 & 50; 12 Peters Rep. 456, that quitting of property with intention of never reclaiming it, is abandonment and loss of title.

The plaintiffs 26th instruction calls on the court to say to the jury that the words and conduct of a person are not *evidence* of abandonment, unless the party was well aware of his rights, was free to do and say as he pleased, was under no improper restraint or influence, and was aware of the effect of such acts, words and conduct, and that they were free and voluntary. The vice of this instruction is, that *it does not leave it to the jury to determine how much* and *what* effect the improper restraint may have had, and that it assumes that an *abandonment* does not work its legal effect unless the party abandoning is an enlightened jurist, and well knows what his conduct will result in. Now if a party does quit possession of his property with the intention it shall no longer be his, he loses it, whether he knows the law or not, and he may be under an *improper influence*, and yet may still be able to abandon his land, the jury perhaps thinking if permitted to pass upon it, that such influence did not cause the abandonment or contributed so little to it as not to be regarded.

The recording act does not repeal the law of abandonment in 1804, any more than it repeals title by descent or escheat or prescription.

10th. The 17th, 19th, 20th, 21st and 22d instructions of plaintiff relate to the act of limitations, and were refused properly.

The 17th is exceptionable in asserting that if the statute begins to run, it is interrupted by the accruing of a disability.

The 19th and 20th assume that the purchase by O'Fallon and Lindell and sheriff's deed to them on 10th August, 1826, deprives the defendant of the right of setting up the previous possession by Conner (who conveyed to O'Fallon in 1820) as adverse to the plaintiffs and others under whom they claim, that is, *a person* in possession of land under color of title, cannot purchase in a claim or pretence, on execution, to the same, under the penalty of creating an estoppel against his previous possessions operating as a bar ! This position is unreasonable and unjust, and not warranted by the authorities. 9 Mis. Rep. ——Macklot vs. Dubruiel repudiates all such estoppels; 8 Cowen 409, 410 shows the practice in New York.

Entry under deed of survey and actual possession of part, claiming the whole, is a possession

of the whole for the purposes of limitation. 5 Peters Rep. 320; 1 Rep, Con't 97; 8 Wend. 410; 1 Littell 260.

SCOTT, judge, delivered the opinion of the court.

An attempt will not be made to review each instruction that was given and refused in this cause. They are numerous, and such a course would lead to great prolixity. It will be sufficient to advert to the main questions of law arising on the facts, and when they are determined, they can with facility be applied in adjusting this controversy.

The view taken of the effect of the act of confirmation by the board of commissioners, will do away with the necessity of investigating the validity of the judicial proceedings in the case of Sarpy against Clamorgan, and of the sheriff's deed under those proceedings, dated July 8, 1808, But it must be said that when consideration is made of the loose manner in which business was transacted in those days, that the ministers of the law were mostly instructed in one system, and acting under another of which they were ignorant, a state of circumstances can scarcely be conceived which would warrant a court in overturning a sheriff's sale of that date, especially as possession has followed and continued with the act. Every consideration of policy in such a state of things requires a liberal indulgence of the maxim *ex diuturnitate temporis omnia presumuntur rite et solemniter esse acta.* As to the alleged want of notice by Clamorgan of the proceedings against him, the cases heretofore decided by this court answer this objection. His appearance is entered of record, and surely that fact cannot be controverted in a collateral proceeding. Indeed, if a writ of error was brought upon this judgment, the ground is not perceived on which it could be reversed. 1 Green Evi. sec. 19; Hart and others vs. Seixas, 21 Wend. 40. But if a judgment is merely erroneous, its validity cannot be questioned collaterally; it can only be affected by a direct proceeding to reverse or vacate it.

A question of importance in the cause, is, as to the operation of the confirmation to Clamorgan : whether it conveyed the legal title of the lot to him or to Conner. After much deliberation, no tenable grounds have been perceived on which the opinion can be based, that by the confirmation the legal title of the lot became vested in Conner. By purchasing Clamorgan's interest in the lot during its pendency for confirmation, Conner became the beneficiary owner of the same, and, under our system of law, he was entitled to a conveyance of the legal ti-

tle. But there is a marked difference between a right to a legal title and the actual possession of it. That difference is as well defined and as well established as any principle of the law. The profession have acted upon it, and the consequences may be foreseen, which may result from its overthrow. That such a cause may disturb titles, is unquestionable. Under the laws involving this question, a confirmation is equivalent to a patent. If the principle contended for is applicable to a confirmation, it is equally so to a patent. When congress enacted that the death of a patentee at the date of the patent should not avoid the grant, but that it should enure to the benefit of the heirs or assignees of the patentee, it clearly expressed its sense of this question.

Nothing is to be found in the acts of 1805 or 1807 which warrants the opinion that the confirmation passed the legal title of the estate confirmed to any other person than the claimant. The act of 1807 speaks of the claimant or his legal representatives ; but clearly it contemplates only those representatives who file their claims before the board as assignees under the original claimant from the Spanish government. If one is a representative, and he does not prefer his claim as such for confirmation, he is not regarded by the act. That Conner's title did not accrue until after the time for filing claims, cannot affect this question. The 4th section of the act of 1805 prescribes that every person claiming lands shall file his claim. The 6th section of the act of 1807 directs that reports of the final decisions in favor of claimants be made to the secretary of the treasury, and that a certificate shall be issued to the claimant showing that he is entitled to a patent ; thus clearly evincing that in the contemplation of congress, the legal title could only pass to the claimant.

The force of the argument drawn from the nature of titles existing in the then territory, is not perceived. Whether they be termed legal or equitable, complete or inchoate, does not affect the question. It is admitted on all hands that the fee of the lot was in the United States, and that an action of ejectment can only be maintained by him in whom that fee has been vested. When a particular person claiming a tract of land, and it is confirmed to him by name, and that confirmation passes the title, how can it be maintained that the title did not pass to the claimant but to some other person. It may be that it ought to have passed to him, but that is not the inquiry. It is, to whom did it actually pass ? Nor is it perceived that the fact that there was no distinction between courts of law and equity at that day, affects this question. It may be that there was no such distinction, but are we therefore to infer

that the Spanish system of jurisprudence was so defective as not to furnish any redress in cases where one obtained a title to land which belonged to another.   If, by that system of law, a beneficiary owner could have maintained an action against the owner of the fee, does it follow that he would at this day be entitled to such remedy under an entire different system ?   The commissioners had no authority under the laws which controlled their action to pass the fee of the government to any other person than the claimant on the record before them.   Had they expressly confirmed the claim to any one except the claimant, their act would have been void.   If, then they could not convey the legal title to any one else than the claimant directly by name, on what principle can their act be held to have done that indirectly which they could not do directly.   The law declared that the action of the board should be final between the United States and the claimant.   The United States and Clamorgan were the only parties to the proceeding before the board, and the board declare that as between them the title is in Clamorgan. By law, then, it must have gone to him.   Under the act of 1807 the decision of the commissioners had the same effect as an act of congress would have had on claims reported under the act of 1805.   Now will any one contend that the act of confirmation passed by congress conveyed the legal title of the lands confirmed to any others than those in whose names the claims were reported ?   The case of Strother vs. Lucas, reported in 6th and 12th Peters, is one involving the construction of the acts under which this confirmation was made.   It is conceded that that case is different from this, but it affords no ground for the opinion that a confirmation of the commissioners enured to the benefit of any one else than the claimant. On the contrary, it fully maintains that a confirmation under a law is as fully and to all intents and purposes, a grant, as if it contained in terms a grant de novo ; and that it is inconsistent with all the acts of congress which have organized boards, that the confirmations of the commissioners should enure to any other uses, or to any other person than the person or persons claiming the confirmation.

The Spanish law of abandonment declared that if a man be dissatisfied with his unmovable estate and abandon it immediately, he departs from it corporeally with an intention that it shall no longer be his, it will become the property of him who first enters thereon.   That although the owner had not corporeal possession of this estate, he would nevertheless retain the property of it in his mind, and therefore no other person ought or can enter upon it.   1st Par. Law 50, page 365. The com-

mon law not being in force in this State prior to 1816, the law of abandonment prevailed here previous to that time. From this law it is manifest that whether a party abandoned his property or not, depended altogether upon his intention to be ascertained from circumstances. It is a question peculiarly appropriate to be submitted to the consideration of a jury. The law is plain when the facts are ascertained. The instruction asked on this subject was properly refused. The phrases "well aware," "free to do or say," "under no improper restraint," were not sufficiently pointed, and might have misled the jury. No doubt an abandonment must be voluntary, nor can there be an intent to abandon without some consciousness of the ownership, of the thing abandoned.

The common law of England was introduced into this State by an act passed 19th January, 1816. By the common law no limitation of time was fixed within which actions were required to be brought. Prior to the fourth year of the reign of James the first, the act of the 32d Henry the eighth limiting the time within which real actions should be brought had been enacted in England; yet from the preamble to the act of limitations, passed 17th Dec., 1818, it would seem that the legislature, acted under the belief that no limitation existed at that time, fixing the period within which real actions should be brought. Hence it might be inferred that the law of prescription did not prevail at the introduction of the common law. Be that as it may, the act of limitations must have abolished all prescription. The proviso of that act permits all persons then having a right of entry, without regard to the period when it accrued, to bring their actions within twenty years. Now ten, twenty, or thirty years would give a right by prescription, according to the circumstances under which the possession commenced. But it is said that as to existing rights of entry, the statutes ought to be construed cumulative to the law of prescription; otherwise a person within a few days of the period at which his title would be perfected by the law of prescription, would be exposed to an action for twenty years after the passage of the act. But take the case where the right had accrued but a few days before the enactment of the statute, could a party under any circumstances, in the very teeth of the law, acquire a right within ten years, as it might have been done under the law of prescription ?

The lot having been confirmed Nov. 13, 1811, ten years, the shortest period within which a title could have been acquired by prescription, had not elapsed before that law was abolished by the statute of limita-

33

tions. The title only passing from the government by the act of confirmation, the statute did not run but from that time. It has been repeatedly held that the statute of limitations does not run against the United States. Lindsay vs. Miller 6 Pet. 666. So the statute of limitations does not run against the government or its grantee in favor of one who does not hold the entire title. Until the title emanates, the possession is not adverse, but under the government. It is analogous to the case of one entering under a contract to purchase. 5 Bin, Morris vs. Thomas 77; 5 Cow. 92; 12 Mass. 327; Johnson vs. Irwin 3 S & R 292, Duke vs. Thompson et al 16 Ohio Rep. 34.

The statute of limitations relative to real actions first introduced into this State is a copy (as were many other of our early laws) of the statute of Pennsylvania. In the construction of the Pennsylvania statute (as it has been of all other statutes on the subject) it has been held that when the bar once begins to run no subsequent disability is regarded, but the action must be brought within twenty years from the time the statute commenced running. Hall vs. Vanderbright 5 Bin. 374. Whatever may be the meaning of the last clause in our statute of limitations which is not found in the act of 21st James 1st, it cannot apply to this case, as the parties do not come within its provisions. Cyprian and Apoline, under whom the plaintiffs claim, were born in June and February, 1803. They consequently attained their majority in 1824, and the statute commenced running against them from that time. Their deaths afterwards, within the twenty years, within which they were required to bring suit, although their title may have devolved on those who were under a disability, did not prevent the running of the statute. The suit was not brought until 1845, consequently the plaintiffs were barred if there were twenty years continued adverse possession.

This court has not adopted the principle that in a contest between two alienees under the same alienor, one of them is estopped from showing an outstanding title adverse to that of his grantor. This doctrine, though prevailing in some courts, was not sanctioned by others, and from the disinclination to receive it, this court thought itself warranted in refusing its sanction. The cases in New York which seem to give countenance to the doctrine that one accepting a title is estopped from claiming adversely to it, prevailed when it was the law of her courts that a grantee could not dispute the title of the grantor. Macklot vs. Dubriel and the cases there cited. The acceptance of the sheriff's deed in 1826 did not estop those under whom the defendant claims. We maintain that a purchaser holds adversely to his vendor. The question

of adverse possession, is one of law and fact. We will not undertake to say that a purchase may not be made under circumstances which would warrant the jury in finding a recognition of the title of the vendor, but we do say that the mere fact of purchasing a title does not by operation of law prevent the vendee from insisting on a possession adverse to that title. A person may be in possession of lands, claiming title and in his anxiety to secure his estate beyond all cavil, or to prevent litigation, buys in an outstanding title of whose defects he knows nothing, nor does he care for them, as he relies on his own original title. If a suit is afterwards brought by one claiming under him from whom the outstanding title is derived, it would be extremely unreasonable that he who purchased the outstanding title, for the sake of quiet and repose, should be precluded from setting up, as a defence to the action, his possession under his original title. Why should men be restrained from buying their peace under the penalty of losing their estates? Are not men daily buying titles adverse to those under which they hold, without any confidence in their validity, but merely to remove specks or shadows from their titles, which may affect the price of their lands in market. A contrary doctrine must have its origin in feudal reasons which have long since ceased to have any influence. *Cessante ratione cessat et ipsa lex.*

It is a matter of history of which this court will take judicial notice, that at the time of the cession of Louisiana to the United States, in that portion of the territory of which this State is composed, nineteen-twentieths of the titles to lands were like that involved in this case prior to its confirmation. There were very few complete grants. Most of the inhabitants were too poor to defray the expenses attending the completion of their titles, but they had faith in their government, and rested as quietly under their inchoate titles as though they had been perfect. Stoddart's sketches 245. As early as Oct., 1804, we find the legislature speaking of free-holders, and authorizing executions against lands and tenements. See law establishing courts for the trial of small causes passed Oct., 1804, sec. 10. There being so few complete titles the legislature in subjecting lands and tenements generally to execution, must have contemplated a seizure and sale of those incomplete titles which existed under the Spanish government. At the date of the act above referred to, no titles had been confirmed by the United States. An instance is not recollected in which a question has been made as to the liability of such titles as Clamorgan's under the Spanish government to sale under execution. It is believed that such titles have been

made the subject of judicial sales ·without question even since the change of government.

As this question was involved in ·the cause and discussed, we have noticed it, although it is not within the course ·prescribed at the beginning of this·opinion.

No error is seen in the refusal of the court to give the instructions relative to the appropriateness of the description of the lot contained in the advertisement under ·which the sale was made to ·O'Fallon and Lindell. Clamorgan owned ·the whole lot and the ·whole was sold. In this respect the case differs from that ·of Evans vs. Ashley. That the lot was subdivided into streets and alleys, 'that it was·sold in mass, and that a greater quantity was sold than was necessary to bring this case, so far as these objections are concerned, within the principle of the case of Hart vs. Rector, reported in the 9th Mo. Rep, It is there shown that such irregularities in a sheriff 's sale will ·avoid them in direct proceedings instituted to vacate them, but that they cannot be annulled collaterally. The authorities are there cited and the argument made, and it is useless to repeat it here.

Whether the description of the premises sold was sufficient, would depend on extrinsic circumstances. If the lot was known by the description given, the sale would be valid according to the principle settled in the case of Hart vs. Rector, 7 Mo. Rep., and parole evidence was admissible to establish that fact.

The seventh instruction given for the plaintiff 's, recognized this principle, and so far was correct, That a part of the description was false, will not vitiate the sale, according to the maxim *falsa demonstratio non nocet*, when the thing itself is certainly described ; as in the instance of the farm called A, now in the occupation of B ; here the farm is correctly designated as farm A, but the demonstration would be false if C and not B was the occupier, and yet it would not vitiate the grant.

The objection to the form of the execution is not sufficient to invalidate the sale to O'Fallon and Lindell. It is important to the interests both of plaintiffs and defendants that the title of a bona fide purchaser at a sheriff 's sale, should not be affected on account of any error or irregularity in the judgment or execution. A writ of error will be upon the award of an erroneous execution. Cokes Ins. If on such writ the execution should be avoided, a previous sale under it would not be affected, more than a sale under an erroneous judgment. Manning's case, 8 Cokes Rep. The authorities cited by the plaintiffs do not support the objection. Under the execution law it was in the power of the

defendants to elect on what property an execution should be levied, whether on real or personal. Dig. 1825, sec. 11. No inconvenience then would likely arise from the form of the execution adopted in this case. Courts might interfere with such process and amend it, or might restrain its execution in any other manner than that authorized by law, but there is no principle on which a sale under it could be declared void in a collateral proceeding.

Prior to the act of Dec. 30th, 1826, the sale of the lands of deceased persons was authorized under executions against their personal representatives. Such sales are expressly allowed by the administration law of 1825, sec. 49, after the expiration of eighteen months from the granting letters testamentary or of administration. Indeed, the right to an execution against a decedent's real estate was never doubted. Scott vs. Whitehill and Finch 1 Mo. Rep. 494, (691) 549, (764.) Rankin vs. Schatzell 12 Wheat. 177.

The instruction to the effect that the statute of limitations did not commence running until the survey of the lot in 1826, was properly refused. The confirmation was a grant of the claim confirmed. A survey of the claim was filed with the board. Our statute relative to ejectments gave an action on a confirmation by the board of commissioners. The survey contemplated by the act of 1807, was a private act, and as it was to be at the costs of the confirmee, it is to be presumed that he would take the initiative in having it made.

The other judges concurring, the judgment will be reversed and the cause remanded.