## MOUNT *vs.* MORTON and others.

A testator, by his will, made in March, 1801, gave to his wife the income of his real and personal estate, during her widowhood. He then devised as follows: "I give and bequeath unto my oldest son, Jacob, the corner lot, on the corner of Hester and Elizabeth streets; I also give and bequeath unto my eldest daughter, Barbara, the lot adjoining the corner, facing Elizabeth street; I give and bequeath to my daughter Eliza, the lot adjoining the above, facing Elizabeth street; and I also give and bequeath to my youngest son, William, the lot adjoining the above." The testator died in March, 1801, and his son William in August thereafter. After the testator's death, each of his four children claimed and took one lot; the corner lot being called Jacob's, the next south, Barbara's, the next, Eliza's, and the next, William's. In 1823, the widow of the testator conveyed to Jacob all her title to any lands of which her husband died seised or possessed. Jacob then conveyed *in fee* to J. S. the whole of lot No. 137, without any thing to indicate that he was selling an undivided interest only in the lot. In 1822, Barbara, with her husband and the widow, mortgaged lot No. 136 to C. for $650; nothing in the mortgage indicating an intention to pass the title to an undivided share only of the lot. This lot was afterwards sold on a foreclosure of the mortgage, and purchased by C. Before this sale, and after the conveyance by the widow to Jacob, the latter conveyed to J. S. all his "estate, right, title and interest" of, in and to lot No. 136, "being an estate in said Jacob M. for the life of his mother." In 1829, Eliza joined with her husband, A., in conveying the whole of lot No. 135 to P. in fee, with full covenants, and without any intimation that the grantors conveyed, or had only an undivided interest in that lot. William died an infant, in 1801, and his estate passed to Jacob, Barbara and Eliza. In 1821, Barbara and Eliza, with their respective husbands, joined with the widow, and conveyed to Jacob, in fee, two undivided third parts of lot No. 134, by a deed, with full covenants as to the estate granted, and describing themselves as co-heirs of William with Jacob. In 1822, Jacob conveyed this lot to P. C., with full covenants, and without any intimation that he conveyed only an undivided share. Barbara died in 1835, leaving six children, one of whom died in 1839. The plaintiff was one of her children. He claimed, that the will gave only a life estate to each child, in each lot; that his mother, on the death of William, was entitled to an undivided third in each lot, in fee; that such right descended to her six children, and on the death of one of them vested in the five survivors; and that the plaintiff was thus entitled to one fifteenth part of lots 136 and 137.

*Held*, 1. That, assuming that the will did not convey to each child the fee of the lot devised to him or her, but only a life estate in it, it was plain that each child must have known that it was the intention of the testator to convey the fee. That slight evidence ought to be sufficient in such a case, that they had determined to carry out the real intent of their father, although not expressed according to law. That here was the strongest evidence that they had so de-

termined, and that they carried out this honest determination; every act of theirs showing that determination, and showing it in a manner strictly comformable to law.

2. That if the will did not give a fee to each child in a separate lot, then each child had a life estate in a separate lot, and they were together tenants in common of the reversion in fee, in all the lots, which reversion descended to them . as the heirs at law of their father, as real estate not disposed of by his will.

3. That if the doctrine of estoppel could be applied so as to prevent parties disturbing a partition, merely because there had been possession under it, there was much more ground for applying it where, as in this case, each owner had, by his or her deed, claimed to own a separate lot in entirety, and had, under that claim, conveyed the land by deed or mortgage, and subsequent foreclosure, and received from the purchasers the full consideration for the entire title to the lot, under this representation, made by all and by each, that each held a lot separately in fee, and without any co-tenant. That all the children of the testator, therefore, were estopped now from denying that each held his own lot in fee and in severalty.

4. That if each of the owners had been together when they conveyed, and had *all* at the same time conveyed to the several purchasers, there could be no doubt that they each claimed to hold a lot in severalty, and conceded to the others the like right. Such conveyance would be conclusive evidence of a *partition* previously agreed on; and they, by their acts, causing others to believe it was made, would be estopped from denying it. That the conveyances, made separately and at successive times, equally established the fact of a partition previously agreed on.

5. That it made no difference that Barbara and Eliza were married women. A married woman can no more be allowed to commit a fraud than a single woman. She is competent to know the difference between fraud and honesty, and to understand the obligation not to stand by and allow another to purchase from her on the supposition that she has a perfect title, when she knows she has not.

6. That these acts and deeds of the parties were such evidence of an actual partition between the parties that a jury or court ought to find that there was an actual partition in fact. And that the several deeds and the mortgage confirmed that partition, so as to bind even the married women; the deeds and mortgages having been acknowledged by the latter on a private examination, so as to pass their title.

It is well settled, that tenants in common may make partition by parol; and that it is binding when followed by possession according to the partition.

APPEAL by the plaintiff from a judgment entered at a special term, in favor of the defendants, with costs. The following opinion, delivered at the special term, states all the material facts:

Mount *v.* Morton.

" MITCHELL, J. The plaintiff commenced his action to recover an undivided fifteenth part of lots Nos. 137, 136, on Bayard's map ; the first at the southwest corner of Hester and Elizabeth streets, and the other on the west side of Elizabeth street, both lots fronting on Elizabeth street. Jacob Meyers, the elder, owned those two lots, and the two other lots, Nos. 135 and 134, next adjoining on Elizabeth street, in 1776, and at the time of his death. He made his will, dated March, 1801, and died in that month ; on the 21st of May, 1801, his will was proved. He left surviving, his widow, Catharine, who died in 1836, and four children—Jacob, born in 1791 ; Barbara, born in 1794 ; Eliza, born in 1796 ; and William, born about 1798. By his will he gave to his wife ' the income of his real and personal estate, during her widowhood.' He gave the four lots above referred to in the following terms : ' I give and bequeath unto my oldest son, Jacob, the corner lot, on the corner of Hester and Elizabeth streets ; I also give and bequeath unto my eldest daughter, Barbara, the lot adjoining the corner, facing Elizabeth street ; I give and bequeath to my daughter, Eliza, the lot adjoining the above, facing Elizabeth street ; and I also give and bequeath to my youngest son, William, the lot adjoining the above.' William died in August, 1801, about five months after his father. Eliza, the daughter, was called as a witness for the plaintiff, and on her cross-examination testified that each one of the four children, after the father's death, took one lot ; that the corner lot was called Jacob's, the next south, Barbara's, the next, Eliza's, and the next, William's ; and that, from the time of the death of her father, each one of the children claimed each a separate lot ; Jacob, the corner ; Barbara, the next ; Eliza, (the witness,) the next, and William, the last. In January, 1823, the widow of the testator conveyed to her son, Jacob, all her title to any lands of which her husband died seised or possessed. In the same month Jacob, the son, conveyed *in fee* to James Sivalls the whole of lot No. 137, for two thousand five hundred dollars, with full covenants of seisin (of title in fee) and for quiet enjoyment, and further assurance and warranty, without any thing to indicate that he was selling an

undivided interest only in the lot. In December, 1822, Barbara, with her husband, and the widow, mortgaged lot No. 136, a vacant lot, to P. Clapp and wife, for six hundred and fifty dollars, with the usual power of sale, and a declaration that such sale should be a perpetual bar, both in law and equity, against the mortgagors, their heirs, &c. Nothing in this mortgage indicated an intention to pass the title to an undivided share only of the lot. The lot was afterwards sold on foreclosure, in chancery, on the 2d July, 1824, to Clapp, for nine hundred and twenty dollars, and by him on the 15th July, 1824, conveyed to Sivalls for the same consideration, with full covenants of title. Before this sale, and after the conveyance by the widow to Jacob, in January, 1823, Jacob Meyers, the son, and his wife conveyed to Sivalls 'all the estate, right, title and interest of the parties of the first part, of, in and to lot No. 136, being an estate in said Jacob Meyers, for the life of his mother, Catharine Meyers.' Eliza married Robert Archbald, in October, 1819, and she joined with her husband, in 1829, in conveying her lot, No. 135, to William Pinckney (by the deed conveying the whole lot in fee with full covenants,) and without any intimation that the grantors conveyed, or had, only an undivided interest in that lot. William having died an infant in 1801, his estate passed to his brother Jacob, and his two sisters, Barbara and Eliza. On the 7th of August, 1821, Barbara and her husband, John Mount, and Eliza and her husband, Mr. Archbald, joined with the widow, and conveyed to Jacob Meyers, their brother, in fee two undivided third parts of lot No. 134 for six hundred and sixty-six dollars and sixty-six cents; the deed describes Barbara and Eliza as co-heirs with Jacob the younger, of William Meyers, and it has full covenants as to the estate granted. Jacob Meyers, in March, 1822, conveyed this last lot in fee for one thousand five hundred and fifty dollars to Peter Cook, with full covenants, and without any intimation that he conveyed only an undivided share. Barbara married John Mount in 1812, and died in 1835, leaving her husband surviving, and six children; the husband died in 1839; one of the children, Albert, died after his mother, but before his father.

George W. Mount is one of Barbara's children. His claim is, that the will gave only a life estate to each child in each lot ; that his mother, on the death of William, was entitled to an undivided third in each lot in fee, and that right descended to her six children, and one of them dying, vested in the five, and that he is entitled thus to one-fifteenth part of lots 137 and 136. He, at the argument, however, claimed only one-fifteenth of two-thirds, considering the conveyance by Jacob as having given a perfect title to one-third, and leaving only the other two-thirds to descend to heirs.

Assuming that the will did not convey to each child the fee of the lot devised to him or her, but only a life estate in it, it is plain that each child must have known that it was the intention of the father to convey to each the fee. Slight evidence ought to be sufficient, in such a case, that they had determined to carry out the real intent of their father, although not expressed according to law. Here, there is not slight but the strongest evidence that they had so determined, and that they carried out this honest determination. Every act of theirs shows that determination, and it is shown in a manner strictly conformable to law. If the will did not give a fee to each child in a separate lot, then each child had a life estate in a separate lot, and they were together tenants in common of the reversion in fee, in all the lots, which reversion descended to them as the heirs at law of their father, as real estate not disposed of by his will.

With us the law is settled that tenants in common may make partition by parol, and that it is binding when followed by possession according to the partition. Kent, Ch. J., says, in *Jackson* v. *Harder*, (4 *John.* 212,) "The validity of the two partitions is not to be questioned. It did not require releases to make the division valid. A parol division, carried into effect by possessions taken according to it, will be sufficient to *sever the possessions*, as between tenants in common, whose titles are distinct, and when the only object of the division is to ascertain the separate possessions of each." The court also say, in *Jackson* v. *Vosburgh*, (9 *John.* 276,) "There is no doubt but that where the *title* is admitted to have been in common, a parol partition

followed up by possession will be valid, and sufficient to sever the possession." The counsel for the plaintiff in the last case admitted the rule, but insisted, as the court also held, that it did not apply there, because a *title* in common was not shown, but the parties held or claimed adversely, and not in common. In *Jackson* v. *Livingston,* (7 *Wend.* 136,) a deed was executed conveying 600 acres *to be surveyed* and taken off a large tract of 15,360 acres; it contained no description of the 600 acres, but a location was subsequently made by the acts of the parties. The court said, (*Id.* 141,) " The deed made the grantees tenants in common with the patentees, and the proceedings locating the right of the grantees operated as a *parol partition,*" and then quoted the above two cases. The chancellor also said, in relation to the same deed, in *Corbin* v. *Jackson,* (14 *Wend.* 619–625,) " The parol partition between her [Madame D'Autremont] and Le Fevre was also valid." Nelson, Ch. J., says, in *Ryerss* v. *Wheeler,* (25 *Wend.* 434–6,) probably affirmed in the court of errors, (*see* 4 *Hill,* 468, *n. a,*) " It has been repeatedly decided in this court, that a parol partition carried into effect by possession and occupation, in conformity thereto, will be binding between tenants in common whose titles are *distinct,* and the only object of the division is to ascertain the separate possessions." The same doctrine was held by Judge Harris, in the court of appeals, in the case of *Baker* v. *Lorillard,* (4 *Comst.* 257–262,) and although Judge Bronson differed with him on some points, as to the title of Pearsall in that case, he expressed no dissent on this point, which related to the Pell title. A partition had been made between Mrs. Macomb, representing the Pell title, and only having a life estate, and her husband on one side, and Mr. Campbell, representing the Pearsall estate, and only having a life estate, but with power to partition, on the other side. Mrs. Macomb, after the partition, became the owner of the reversion in fee by the death of her daughter. *In* 1840 *she sold the premises allotted to her.* Judge Harris says, page 262, she " thus *affirmed the validity* of the partition. Having thus ratified the partition made by her when a *feme sole,* and when she was only entitled to a life estate, I think she is *estopped* from

making *any* claim to the premises. Such a confirmation is at least equivalent to a partition by parol, which, it has been often held, will, when accompanied by livery of seisin, bind tenants in common holding under distinct titles"—" as Mrs. Macomb, after she became entitled to the whole estate, has taken the benefit of that division, it must be held conclusive as to her and those claiming under her." Mrs. Pell was married when the partition was made, but single when she conveyed, in 1840. (*See p.* 259, 60.)

But a married woman is as competent to confirm an act done by her, if she confirm it by a deed acknowledged so as to pass real estate, as any other person. It may be said that the separate possession here was consistent with the ownership of a life estate only in each lot, and of the reversion in common to all. But that, with the separate claim of sole title in fee in each lot, and the conveyance according to such claim, was not consistent with an ownership in common in the reversion.

If the doctrine of estoppel can be applied so as to prevent parties disturbing a partition merely because there has been possession under it, there is much more ground for applying it. where, as in this case, each owner has by his or her deed, claimed to own a separate lot in entirety, and has under that claim conveyed the land by deed or mortgage, and subsequent foreclosure, and received from the purchasers the full consideration for the entire title to the lot, under this representation made by all and by each, that each held a lot separately in fee, and without any co-tenant. Here Barbara and Eliza joined with their husbands, in 1821, in conveying to their brother, Jacob, two-thirds of the lot that was devised to William, and in their deed they describe themselves as co-heirs *of William* with Jacob. If, as claimed by the plaintiff, there was no separate ownership in fee of each lot, then this representation was false. William had only a title to this lot for life, and a reversion in fee in one-fourth of it, and Barbara and Eliza, instead of being co-heirs with him in that respect of one-fourth of the lot, and able to convey to him as such co-heirs, had only two-thirds of that one-fourth. Jacob, also, then continued the misleading when he sold the title to the whole lot, in March of the next year, to P. Cook,

and those conveyances executed by them, or the first of them, would naturally lead those who dealt with them to believe that they owned each the lot held by him or her in severalty, and had no claim on any other. Then the same belief would be confirmed by the mortgage by Barbara and her husband, in December, 1822, of lot No. 136, and the sale on foreclosure of the same lot, in July,1824, in a suit in which they both were parties, and by the deed by Jacob in January, 1823, to Sivalls expressly, of *all* his estate in the lot No. 136, and there describing it as being an estate for the life of his mother. This was a distinct declaration to all who dealt with the estate, that he had no title in that lot, except for the life of his mother, and that could only be (if the will did not give each a separate lot in·fee) because each had consented to a partition, and taken one lot as his share of the whole. Jacob still further confirmed this belief, and repeated the representation of sole ownership, when he conveyed, in 1823, the whole of lot No. 137 to Sivalls, in fee, and Eliza and her husband finally confirmed them all, when they conveyed in fee the remaining lot No. 135, as the sole owners of it. These acts of the several owners, partly concurrent, as in the deed for William's lot, and partly separate, tended as much to mislead each purchaser, (unless the parties actually owned in severalty, or are estopped from denying that they so owned,) as if the owners had actually represented that they so owned. Eliza, the last to convey, stood by and saw the others convey the other lots as the absolute owners of it, and set up no claim to them ; but, as if to confirm the correctness of those sales, she, with her husband, sold the whole of the lot held by her, and they received the purchase money as for the whole. They all, therefore, are estopped now from denying that each held his own lot, in fee and in severalty. If all of the owners had been together when they conveyed, and had at the same time conveyed to the ·several purchasers, there could be no doubt that they each claimed to hold a lot in severalty, and conceded to the others the like right. That would be conclusive evidence of a partition previously agreed on, and they causing by their acts others to believe it was made, would be estopped from denying it. The

Mount *v.* Morton.

conveyances, made separately and at successive times, equally establish the fact of a partition previously agreed on, although not in so striking a manner. It is true, here there was a partition for the life of each, but the acts of the parties in conveying the fee in each lot, show that that was not the only partition that they had agreed to, but that it was a partition as to the whole title to the lots. Nor was this partition so unequal as at first it might seem. Jacob had the most valuable lot, but its extra value arose principally, if not entirely at that time, from the building on it; and as he had a life estate in that lot, that building would be worth but little after the expiration of that estate of his, so that what was held in common, one-fourth of the reversion, in all four of the lots, was nearly the same as the reversion in the whole of any one lot. If the owners were misled as to the law, and supposed they owned the fee, they ought not the less to be estopped, as they, by their acts, led others to purchase under the same belief, and they have each received nearly, if not quite the same value as they would have received if they had sold the reversion in one-fourth of each lot.

It makes no difference, in this view of the case, that Barbara and Eliza were married women. A married woman can no more be allowed to commit a fraud than a single woman ; her deed is not valid, unless when relating to real estate and duly acknowledged, but she is liable for torts committed by her, and is competent to know the difference between fraud and honesty, and to understand the obligation not to stand by and allow another to purchase from her, who supposes she has a perfect title when she knows she has not.

Another view of the case is equally fatal to the plaintiff's claim. These acts and deeds of the parties are such evidence of an actual partition between the parties that a jury or court bound to draw conclusions from the evidence before it, ought to find that there was an actual partition in fact, and then the several deeds and the mortgage confirm that partition, so as to bind even the married women ; the deeds and mortgages having been acknowledged by the married women on a private examination so as to pass their title. Eliza (the witness, now Mrs. Archi-

bald) shows expressly that each took possession of a separate lot, and *claimed* it as his or her own in severalty. The lots, too, were separated, in fact, from each other, the corner lot having a house on it, and lot 135 a house on it, the last erected after the testator's death.

If, as is probable, the statute of limitations cannot apply in this case, notwithstanding the lapse of so many years, it makes it more important that those principles which are preventive of fraud, should be liberally applied.

Judgment should be entered for the defendants, with costs."

*John Townshend,* for the appellant. I. On the death of Jacob Myers, senior, his widow, by virtue of his will, took an estate for life in the four lots Nos. 134, 135, 136, 137. (*Jarm. on Wills,* ed. 1844, *p.* 534.)

II. By the will, Jacob, the son, took a life estate in lot 137; Barbara a life estate in lot 136; Eliza a life estate in lot 135, and William a life estate in lot 134. (*Edwards* v. *Bishop,* 4 *Coms.* 61. *New* v. *Mesick,* 3 *Seld.* 163.)

III. The reversion in the four lots descended to Jacob, Barbara, Eliza and William, and they held the same as tenants in common, in fee.

IV. From the testator's death each of his children claimed a separate lot; each lot was called after the child to whom it was devised by the will; each child took one lot. William died five months after his father, in 1821. Barbara and Eliza, the co-heirs with Jacob, of William, and the testator's widow, conveyed to Jacob two undivided thirds of lot 134, and in 1822, Jacob conveyed lot 134 in fee to Peter Cook. In 1822 Barbara mortgaged lot 136, describing it as the lot devised to her by the will of Jacob Myers, to Philip Clapp. On 25th January, 1823, testator's widow conveyed to Jacob all her estate in said four lots being an estate for her life. To this time she collected the rents. There was only one house on the lots at the testator's death; that was on the corner lot. Testator's widow lived on the third lot from corner—lot 135; she put a building on the lot. There was a vacant lot intervening. Jacob, after the deed from his

mother, built on the intervening lot. On 27th January, 1823, Jacob conveyed lot 137 in fee to James Sivalls, and on the same day Jacob conveyed to said Sivalls lot 136 for the life of his (Jacob's) mother. Jacob died in 1823. Jacob's widow married William Hicks. In 1825, Jacob's widow and administratrix conveyed to Eliza's husband the lot devised to Eliza (lot 135) for the life of Catharine. After this, and not till this, Eliza took possession of her lot. In 1829, Eliza and her husband conveyed lot 135 to W. T. Pinkney. The lot is described as the lot devised to Eliza, and Pinkney paid off the mortgage on it. In 1824 the mortgage of Barbara was foreclosed, said Sivalls being made a party to the suit. On the foreclosure sale the premises were sold to Clapp, and immediately after conveyed by him to said Sivalls. Sivalls held possession of lots 137 and 136 from 1823 to 1828. The testator's widow died in 1836. From these facts, it is evident, (1.) That not one of the testator's children was ever in possession as devisee of the lot devised to him or her. (2.) Jacob had possession only as vendee from his mother. (3.) Eliza never had possession, and her husband only as vendee from the widow of Jacob, the son. (4.) Barbara never had possession. (5.) That *from the death of the testator* each child claimed the remainder in fee, expectant, on the death of their mother, of and in the lot by the will devised to him or her respectively. (6.) That when Sivalls bought of Jacob, he (Sivalls) had notice of the will of Jacob's father, and of the estate each child claimed under it. (7.) That when Barbara mortgaged to Clapp, he knew of the will of her father and the estate each child claimed under it. (8.) There is no proof that any child knew of the dealings with the property by the other. (9.) There is no proof that each child obtained the value of the whole lot. (10.) There is no proof of any intent to mislead, nor that any purchaser was actually misled.

V. Presumptions are only indulged in where there are no other means of ascertaining the fact; (3 *Black. Com.* 371, *Oxford ed.* 1773. 14 *Eng. L. & Eq. R.* 223. *Black* v. *Wright,* 9 *Iredell's R.* 447,) and if a party having conclusive evidence in his power resort to weaker proof, the presumption

is that the conclusive evidence is adverse to him. (*Roe* v. *Harvey*, 4 *Burr.* 2484–7. *Curlewis* v. *Corfield*, 1 *Q. B. R.* 814. *Lobb* v. *Stanley*, 5 *id.* 574. *Bell* v. *Frankis*, 4 *M. & G.* 446.)

VI. The presumption of partition is inconsistent with the facts of the claim of each child of a lot in fee *from the death of the testator ;* and "if any established circumstance is wholly repugnant to the hypothesis, the hypothesis cannot be true." (3 *Stark. Ev.* 483, 505.)

VII. To ascertain the testator's intention, the court must look to the language of the will, "and apply to it the established rules of law." (*Jackson* v. *Winne*, 7 *Wend.* 52. *Davidson* v. *Davidson*, 1 *Hawks*, 181. *Chandless* v. *Price*, 3 *Ves.* 102.) And the testator's intention thus ascertained, the court will presume that the children meant to carry out that intention. (*Jackson* v. *Christman*, 4 *Wend.* 284.)

VIII. The conveyance by Barbara and Eliza to Jacob, negatives a partition. William died five months after his father, aged three years. Eliza was then aged 5, Barbara 7, and Jacob 10, and there is no ground for presuming a partition among these infants. At the time of the conveyance to Jacob, in 1821, William's lot was treated as though he took it in fee under the will, showing that the children considered the will gave each a lot in fee ; also, that no partition had been made since the death of William, or his lot would have been included ; also, that no partition was considered necessary, and this was further shown by their subsequent acts.

IX. The fact that each deed purports to convey the whole lot, and not an undivided part, furnishes no ground for presuming a claim of a *sole ownership in fee.* (*Jackson* v. *Mancius*, 2 *Wend.* 357.) Tenants in common have a joint possession. (*Cole* v. *Irvine*, 6 *Hill*, 634.) And in a conveyance by a tenant in common of an undivided share, the conveyance is properly of the whole. (*Edwards* v. *Bishop*, 4 *Coms.* 64.) Besides each grantee had the *whole* lot for life. (*Doe* v. *Reed*, 5 *B. & Ald.* 232. *Livett* v. *Wilson*, 3 *Bing.* 115.) And the conveyances being by deeds operating under the statute of uses, only conveyed such an estate as the grantor actually had in the prem-

Mount *v.* Morton.

ises. (*Jackson* v. *Brinckerhoff*, 3 *John. Cas.* 101. *Sparrow* v. *Kingman*, 1 *Coms.* 251. *Collyer* v. *Mason*, 2 *Brod. & Bing.* 685.)

X. The claim of title is so far accounted for by the will as to rebut the presumption of a partition. (*Doe* v. *Millett*, 12 *Jurist*, 1021, *Doe* v. *Powell*, 8 *Q. B. Rep.* 576.) The presumption is that the claim was founded on the will. (*Benson* v. *Bolles*, 8 *Wend.* 175, 181.)

XI. There can be no presumption of a parol partition. A parol partition can only be among tenants in common holding under distinct titles, and must be accompanied by livery of seisin or followed by possession. (*Baker* v. *Lorillard*, 4 *Coms.* 257.)

There cannot be a presumption on a presumption. (*Hammond, adm'r*, v. *Smith*, 17 *Verm.* 231. *Pennington* v. *Yell*, 6 *English*, [*Ark.*] 213. *Duncan* v. *Little*, 2 *Bibb's R.* 26.) If, therefore, from the acts of the parties, it may be presumed that each claimed a sole estate in fee in a single lot, the presumption must there rest. That presumed fact cannot be made the basis of the further presumption that that claim arose out of a partition, and not from the will; especially as the will shows enough to warrant the presumption that the claim was founded on it, and the reasonable and legal presumption is, that each child supposed the will gave him or her a lot in fee, and that the purchasers from the children were of the like opinion.

XIII. There is no evidence nor ground for presuming that in the dealings with the property by the testator's children there was any concealment of the will. The defect in the claim of title in fee was therefore *obvious*, and the presumption is, the defect was known to the purchaser. (*Platt* v. *Scott*, 6 *Blackf.* 390. *Lewis* v. *Jones*, 4 *Barn. & C.* 506. *Lane* v. *Shears*, 1 *Wend.* 433.) Fraud is never presumed, (*Dardume* v. *Hardwick*, 4 *Eng. R.* 482,) and cannot be inferred by argument. (*Austin* v. *Cummings*, 10 *Verm. R.* 26.)

XIV. Estoppels are not favored—they are odious—to be used as a shield sometimes, never as a sword. When an estop-

pel *in pais* takes place, (*Carpenter* v. *Stilwell,* 1 *Kernan,* 61. *Lawrence* v. *Brown,* 1 *Seld.* 401. *Wright* v. *Douglas,* 10 *Barb.* 97. *Griffith* v. *Beecher, Id.* 432. *Ryerss* v. *Farwell,* 9 *id.* 615. *Warren* v. *Leland,* 2 *id.* 622. *Sinclair* v. *Jackson,* 8 *Cowen,* 543. *Brannock* v. *Bouldin,* 4 *Iredell's Law R.* 61. *Lewis* v. *Carstairs,* 5 *W. & S.* 209. *Watkins* v. *Beek,* 12 *New Hamp.* 373.)

XV. The estate each child took under the will was a question of law. Their assertion of estate was only their construction of the will. It was not a question as to the quantity of land, but the quantity of estate in the land. A party is not estopped by his assertion of a conclusion of law. (*Brewster* v. *Striker,* 2 *Coms.* 41. *Chautauque Bank* v. *White,* 2 *Seld.* 253. *Jewett* v. *Miller, Court of Appeals, Dec.* 1852. *Moore* v. *Hitchcock,* 4 *Wend.* 292. *Hawley* v. *Bennett,* 5 *Paige,* 104. *Cowper* v. *Cowper,* 2 *P. Wms.* 720. *Mathews on Pres. Ev.* 198. *Selden* v. *Vermilya,* 3 *Coms.* 534.)

XVI. All estoppels must be mutual, and they bind only parties and privies. (*Sparrow* v. *Kingman,* 1 *Coms.* 247. A grantee in a deed is never estopped to deny his grantor's title. (*Sparrow* v. *Kingman,* 1 *Coms.* 247. *Averill* v. *Wilson,* 4 *Barb.* 180. *Hill* v. *Hill, id.* 419.) Jacob's deed to Sivalls did not estop Barbara's children. Eliza's deed did not estop Barbara's children. The mortgage by Barbara did not estop the claim of her children on Jacob's lot. (*Lawrence* v. *Brown,* 1 *Seld.* 401. *Jackson* v. *Brinkerhoff,* 3 *John. Cas.* 101.) The declaration in the mortgage by Barbara and her husband that a sale should be a perpetual bar did not bind her children. (*Dominick* v. *Michael,* 4 *Sand. S. C. R.* 423. *Albany Fire Ins. Co.* v. *Bay,* 4 *Coms.* 9. *Doe* v. *Errington,* 6 *Bing. N. C.* 83. *Jackson* v. *Vanderheyden,* 17 *John.* 167. *Carpenter* v. *Schermerhorn,* 2 *Barb. Ch. R.* 314.)

XVII. The decree of foreclosure did not bar Barbara and her heirs. It was *pro confesso.* (1 *R. L.* 102, § 3.) Barbara had no next friend. (*Lewis* v. *Smith, Court of Appeals, April,* 1854. *Voorhies' Code, p.* 89, *note.*)

Mount *v.* Morton.

*Jas. R. Whiting,* for the respondents. The premises in question are parts of the lots, called in the conveyances No. 137 and No. 136, the first being the corner lot, and the other the lot adjoining the corner, No. 137 being the same given by the will to Jacob, and No. 136 being the same given by the will to Barbara.

I. The fee of those lots was vested *by the will* in Jacob and Barbara severally. It is undoubtedly true that prior to the revised statutes the word " give," alone, did not in a will create a fee ; but it has always been held that no technical words are necessary to carry a fee, and that the intention, if it can be legitimately gathered from the *various provisions* of the will, is to govern. The words " give my *estate,"* have been held to carry the fee. (*Jackson* v. *Babcock,* 12 *John.* 389. *McLean* v. *McDonald,* 2 *Barb. S. C. R.* 534.) The intent of this testator is to be gathered from all the provisions of this will, and looking at them, it cannot be doubted that he intended to vest the fee of those lots in his children. (1.) He clearly intended to dispose of all his interest in the property, for he gives an estate for widowhood at least, and contingently, (and in point of fact in this case,) for life to his widow, and then " gives" the lots to his children ; it has never been decided, and I trust never will be, that when an estate for life is devised to A. in a lot, and then the lot is " given" to B., that B. takes only a life estate. Such a decision and construction would be a manifest absurdity. (2.) The testator uses the word " give," in the clause as to the farm ; in that clause, his clear intent is to dispose of the whole interest, for he directs the sale and conversion into money, and its appropriation to the use of his four children. The word " give," here, must have been used to create a fee, otherwise the sale of the farm would produce nothing, and then nothing could be got for the use of the children. The widow already has an estate in the farm during her life, if she do not marry, and at all events during her widowhood, and of course any sale of the farm must be subject to this interest. Now if the children have only a life estate in the farm, the sale of such an estate subject to the widow's estate, manifestly would produce nothing effective for the children's use. Where-

Mount *v.* Morton.

as the sale of the fee, subject to the widow's rights, would produce a substantial sum. The word " give," therefore, in this clause operates to carry a fee, according to the clear intent of the testator, and having used the word here for that purpose, it shows what meaning he intended for the same word—in what sense he used it in the preceding clause, and this is a fair and legitimate rule of construction—a proper and careful mode of arriving at the intent and meaning of the testator in his use of the word " give," in his will generally. (3.) If the word " give" is not held to create a fee in these lots, it follows that all the testator gave, or intended to give to his children, was a life estate, subject to the life estate, or, at any rate, to the freehold estate already given to his wife; such an interest would be valueless, or next to valueless, and it cannot be supposed that a father so intended. The rule of the common law being, that the word " heirs" whether in a will or deed, was requisite to create a fee, it was held that the word " give" alone did not create that estate ; but, the rule being equally undoubted, that in a will the intention is to govern, if that intention can be ascertained by construing all parts of the will together, it has not I apprehend ever been doubted, that the word " give" without the word " heirs," would vest a fee, where from other provisions of the will the intent to create such an estate was manifest. In the cases where it has been held that the word " give" did not carry a fee, there have been no other clauses or provisions in the will, going to show that the testator must thereby have intended to vest a fee. It is a fact undisputed in this case, that the four devisees were the testator's only children.

II. If the will did not give a fee, there was an actual practical partition of the premises conformably to the provisions of the will, and possession taken and claim of ownership accordingly, commencing immediately on the death of the testator, and continued uninterruptedly down to the time of the commencement of this suit, a period of over fifty years. This actual partition vested the title to the lots in the children severally. (9 *John.* 270. 4 *id.* 202. 25 *Wend.* 434, 6. 7 *id.* 136. 14 *id.* 619. 4 *Comst.* 257.)

Mount *v.* Morton.

III. Assuming that the children took by descent, and thus originally were technically tenants in common of each lot, no aid can be derived to this plaintiff from this consideration, because each took possession in severalty under claim of title, and so held exclusive of all the others, and in hostility to them, and exercised all acts of ownership ; as using, improving, mortgaging, selling, &c. and thus there was, what was equivalent to an actual ouster of the co-tenants. There were acts in abundance "amounting to a total denial of the rights of the other co-tenants." (*See* 2 *R. S.* 306, 307, § 27, 1*st ed.*) A conveyance by one co-tenant of the whole estate is an ouster of his co-tenants, and a good foundation for a claim of adverse possession in the grantee. (13 *John.* 406. 9 *Cowen,* 530. 4 *Paige.* 178. 15 *Wend.* 111.)

IV. As to lot 136, all claim of this plaintiff, (his claim being solely as heir of Barbara,) is barred by Barbara's mortgages, followed up by foreclosure and sale, and a master's deed in 1824, vesting the whole title in the grantee in that deed, and under that grantee we claim.

V. As to both lots, 137 and 136, to say nothing of the adverse possession by Jacob himself, of lot 137, the testimony is clear, that an actual adverse possession by the grantees of Jacob, (as to 137,) commenced as early as 1823, and by the grantees of Barbara (as to 136,) commenced as early as 1824, and that from those years down to the present time, both lots have been actually possessed, and held under claim of title adversely to Barbara and her heirs. The plaintiff as above stated, claims only as heir of Barbara, and can recover only on her title. She died in 1835, and this suit was commenced in 1852. Admitting that the 25 years, (and not the 20 years) limitation applies to this case, it expired as to both lots certainly, as early as 1849 ; and assuming that Barbara was under the disability of coverture when the statute commenced running, the 10 years allowed to her representatives, after the termination of that disability by her death, in 1835, expired in 1845, and if it is conceded that the 10 years did not commence quoad her representatives till the termination of her husband's estate by the curtesy, still

that period, (the 10 years) expired in 1849, he having died in 1839. There is then no mode of escape for this plaintiff from the effect of the statute of limitation. It is a conclusive bar. (2 *R. S.* 295, §§ 16, 17, 1*st ed. Id.* 293, § 5. *Fleming* v. *Griswold,* 3 *Hill,* 85. 4 *Denio,* 201. 2 *Barb. Ch. R.* 314.)

VI. No benefit can arise to this plaintiff in consequence of the life estate given to the widow by the will; she conveyed this to Jacob in 1823, and his death in that year terminated that estate, assuming it not to have been otherwise extinguished. The conveyance to Jacob extinguished the particular estate *pro tanto.* It was merged. By his conveyance to Sivalls and Cook it became merged in those lots. (4 *Kent's Com.* 100, 7*th ed.* 103.)

VII. This action being the substitute for a writ of right, the plaintiff is bound to show an actual seisin or possession, or pernancy of the rents and profits within 25 years before suit brought. This he has failed to do; and indeed the contrary is clearly shown. But it is proper to say that this position may not be tenable in view of 2 R. S. 293, § 8, 1st ed.

VIII. Assuming the truth of the testimony of the plaintiff's attorney, this claim is one on which every court will look with the greatest disfavor, and will enforce only from the sternest necessity.

*By the Court,* CLERKE J. I am of opinion that the judgment in this case should be affirmed, with costs, for the reasons stated by the judge at special term.

Judgment affirmed.

[NEW YORK GENERAL TERM, May 7, 1855. *Mitchell, Clerke* and *Cowles,* Justices.]