HARVEY et al., Appellants, v. RUSCH.

1. **Lands and Land Titles:** CLAIM TO LAND, SUSCEPTIBLE OF CON-
FIRMATION. The concession to Camp and Reilhe, by the Spanish
Lieutenant-Governor, of date December 3rd, 1796, and a survey of
the land so conceded on the 31st day of December, 1796, by the
Spanish Surveyor-General, constitute a claim upon which the act of
Congress of July 4th, 1868, relinquishing the title of the United
States *to the legal representatives of C. & R.*, can operate ; and there is
no material difference between such a relinquishment and one *to C.
& R., or their legal representatives.*

2. ———: ———: EVIDENCE OF SUCH CLAIM. The recitals of such
concession and survey in a grant, complete in form, by the Spanish
Intendant-General to C. & R., of the land so conceded, in fee
simple, of date June 19th, 1802, although such grant be invalid
because made after the treaty of St. Ildefonso, of October 1st, 1800,
are evidence of the concession and survey sufficient to justify the
operation of the act of 1868 as a confirmation.

3. ———: M'NAIR V. HUNT, 5 MO. 300, AFFIRMED. It was virtually
decided in McNair v. Hunt, 5 Mo. 300, that the respondents are the
legal representatives of Reilhe, and this court declines to review
that decision

*Appeal from St. Louis Court of Appeals.*

*P. E. Bland* for appellants.

*Glover & Shepley* for respondents.

NAPTON, J.—There are only two questions in this
case, one of which was decided by this court in the case of
*McNair v. Hunt,* 5 Mo. 300, and the other is based upon
the nullity of the grant of Morales in 1802, which seems
not to have been suggested in that case, which involved
the same title as this, which grows out of the construction
of the act of Congress of July 4th, 1868, a special act in-
tended to relinquish the title of the United States to the
land now in controversy.

In regard to the first question, concerning the validity
of the purchase by Gregoire Sarpy of the title of Reilhe,

3. ——: McNair v. Hunt, 6 Mo. 300, affirmed. we are not disposed to review the decision of this court made forty years ago.

Upon the second point chiefly relied on here, concurring as we do in the conclusion of the St. Louis 2. LANDS AND LAND TITLES: claim to land susceptible of confirmation. court of appeals, we deem an extended examination of the position of the learned counsel for the plaintiffs unnecessary, and refer to Judge Gantt's opinion for a full statement of the facts and instructions given on them, and the grounds upon which that court reached their determination. It is insisted in the argument here that the act of Congress of July 4th, 1868, is a grant and not a confirmation—because the grant of Morales in 1802 was a nullity, and therefore incapable of confirmation. It is not necessary in this case to maintain the validity of the Morales grant—but we must be allowed to say that, in our opinion, its nullity is by no means clear. This grant was made after the treaty of St. Ildefonso, but before the royal order at Barcelona, on the 15th of October, 1802. The treaty was provisional and secret, and until the order promulgated in October, 1802, the Spanish authorities here, upon general principles of international law, would seem not to have been deprived of their previous powers in regard to grants. It is true that, in 1806, Congress declared all grants by Spain after the 1st of October, 1800, to be void, and the courts of the United States of course considered this declaration binding, and so declared in *Foster v. Neilson*, 2 Peters 299; *Garcia v. Lee*, 12 Peters, 515; and *United States v. Reynes*, 9 Howard 127. The grants in each of these cases were for large tracts of land east of the Mississippi, and in a district of country the title of which was disputed until the treaty of Spain of 1819. And if the United States, in the present case, had granted the land now in dispute to any one else, the declarative act of 1806 would unquestionably have defeated any claim under Spain. But in giving a construction to the act of 1868, passing the United States title to the legal representatives of Camp and

Reilhe, it is not so clear that the concession of the Intendant at New Orleans, in 1802, should be regarded as a nullity. Conceding, however, that Morales had no power after the treaty of St. Ildefonso (1st of October, 1800,) to grant lands in upper Louisiana, the previous concessions of Trudeau and survey by Soulard, referred to by Morales and made in 1796–7, undoubtedly constituted a claim upon which the act of 1868 could operate. The object of the act was to relinquish the United States title to the representatives of the original claimants. The distinction between a confirmation to Camp and Reilhe or their legal representatives, and one to the legal representatives of Camp and Reilhe, is not perceived. It was of course known in 1868 that Camp and Reilhe were both dead half a century or more before the act was passed; the relinquishment was therefore made to their legal representatives. That they had no perfect title from Spain, or were supposed not to have, may be inferred from the passage of such an act, but the imperfection of the Spanish title, or its entire nullity, could surely not imply that there had been no claim. The act was based on the hypothesis that there was an infirmity in their title from Spain.

The records of their official representative in the department recited a survey by Soulard, on December 6th, 1797, for Camp and Reilhe. The grant of Morales recites the concession by Trudeau, and the survey of Soulard, and, if useful for no other purpose, was undoubtedly evidence of such concession and survey, since the governor could have had no information of such grant and survey, except officially. They were necessarily sent to him to procure a perfect title, and his recitals in what he supposed to be a perfect grant are certainly evidence of a claim sufficient to justify the operation of the act of 1868 as a confirmation. That defendants are the legal representatives of Reilhe in regard to his title was virtually decided in the case of *McNair v. Hunt.*

2. ———: ———: evidence of such claim

The judgment of the court of appeals is therefore affirmed, with the concurrence of all the court.

AFFIRMED.

The opinion of the court of appeals, delivered by Gantt, J. P., is as follows:

1. On the 19th of June, 1802, a grant, complete in form, was made by Morales, Intendant-General of Spain, reciting that a concession or preliminary permission to settle and cultivate had been issued by Zenon Trudeau, Lieutenant-Governor, on the 3rd of December, 1796, and had been surveyed, by Soulard, on the 21st of December, 1796, of a tract of 2,905 arpents, 56 perches and 40 feet of land, on the river Des Peres, for Madame Anna Olivia Camp and Antoine Reilhe, and, thereupon, the Intendant-General, Morales, granted the tract so surveyed to Anna Olivia Camp and Antoine Reilhe in fee simple. 2. Antoine Reilhe died February 25th, 1802, leaving a will, dated February 19th, 1802, whereby he devised all his estate (his wife being dead) to his three children : Margaret, afterwards Mrs. McNair ; Estelle, afterwards Mrs. Harvey ; and Antoine. By his wife he appointed Gregoire Sarpy executor and also guardian of his children. 3. In the execution of his trust, Sarpy made sale, after three offerings, of a tract of 1,452 arpents, described as a farm belonging to the decedent, bounded on one side by land of Widow Camp, on the other by land of Carondelet, and on the other by the Royal Domain, to himself, as the highest bidder, for $820. This sale was made with all the solemnities of the period in the presence of the Lieutenant-Governor, who, at that time, united in his own person both executive and judicial functions. We do not speak with entire precision, according to the sense of these terms as understood in American jurisprudence ; but Lieutenant-Governor Delassus made the decree for the sale of the land of Reilhe, and the order made by him was executed in his presence and by his authority. The property was offered for sale

by public proclamation, and by the public autioneer or crier. Gregoire Sarpy was the highest, last and best bidder for it, and it was sold to him with the consent and approval of Delassus, who certified to the fact under his own hand. The land was, according to the customs of those days, set up and bid for on three different days. On the first of these, March 21st, 1802, the highest bidder was Joseph Motard, who bid $100; on the next occasion, 25th of March, 1802, $150 was bid by I. M. Benoit; on the last, which was on 28th of March, 1802, the sum of $820 was bid by Gregoire Sarpy. In each case the sale was made at the door of the church at the close of the parochial mass, and, on the two first occasions, proclamation was made that the following offering would be made on the 25th and 28th of March, respectively, at the same place at the close of high mass. 4. It seems that an informal division of the whole tract had been already made between Madame Camp and Antoine Reilhe in his life time. The deceased wife of Reilhe was a daughter of Madame Camp. On the 12th of March, 1803, Gregoire Sarpy, claiming to hold, by virtue of the sale above mentioned, the interest of Antoine Reilhe, made with Madame Camp a partition of the larger tract. In this partition the farm adjudged to him on 28th of March, 1802, was set off to him, and the residue of the tract was set off to Madame Camp. A plat, or diagram, of the tract was made accordingly. The surveyor, Don Antonio Soulard, certified that, agreeably to the request of Madame Anne (Widow Camp) and Mr. Gregoire Sarpy, and to the decree of Lieutenant-Governor Charles Dehault Delassus, dated 2d of March, 1803, he repaired, on 7th of March, to the plantation of the parties, describing it in such a manner as to identify the tract. He proceeded to make the partition, recited that the party receiving the larger tract was to pay the other fifty cents per arpent for the excess, and laid off to Gregoire Sarpy 1,632 arpents, 48 perches, one hundred and five feet, nine inches, and to Madame Camp 1,273 ar-

pents, 7 perches, 34 feet, 9 inches; declared that the difference was 359 arpents, 41 perches and 71 feet, for which Gregoire Sarpy was to pay Madame Camp fifty cents per arpent; that the partition was made agreeably to the wishes of Gregoire Sarpy and the attorney of Madame Camp. This paper was signed by Anton Soulard, Gregoire Sarpy and the attorney of Madame Camp on the 12th of May, 1803. 5. The representatives of Madame Camp (who died in October, 1803,) filed with the recorder of land titles, on the 10th of March, 1808, a claim for the half of the grant made by Morales. It does not appear that they referred to the partition made between their ancestor and Reilhe; they spoke of him as joint tenant with their parent in the grant. The claim was rejected because the grant made by Morales was subsequent to 1st of October, 1800—the date of the treaty by which Spain ceded Louisiana to France. 6. Frederick Bates, recorder of land titles for the Territory of Missouri in 1815, reported to the surveyor-general a list of complete titles under the French and Spanish governments. There were eleven in number: three of them were to Charles Gratiot, one to Auguste Chouteau and Jacques Clamorgan under Regn. Soirel, one to Penrose under Cerre, one to Easton under Cerre, one to Charles Sauquinette, one to Jacques Sobrain, and one was this of 2,905 arpents to Madame Camp and Antoine Reilhe. 7. The claim treated as having been founded on a complete grant was surveyed by the United States as S. 3,217, but no patent was procured on the patent certificate issued thereupon in 1846. 8. On 4th of July, 1868, an act of Congress was passed releasing to the legal representatives of Ann O. Camp and A. Reilhe all the right, title and interest of the United States to the land within survey 3,217; providing, however, that nothing therein contained should abridge, divest, impair, injure or prejudice any adverse right, title or interest of any person or persons in or to any portion, &c., of the aforesaid land, &c. 9. All that part of the tract of 2,905 arpents

which accrued to Sarpy by virtue of the partition of 1803 between him and Madame Camp was sold by the sheriff to P. Chouteau on June 29th, 1808. It is admitted that defendants claim, under P. Chouteau, part of his tract, and that, by themselves and those through whom they make title, they have been in possession of the land, with claim of title, since 1808. Plaintiffs are some of the heirs of the children of Antoine Reilhe and his wife, Margaret, who was a daughter of Madame Camp. At the trial they gave evidence of their genealogy, the act of 4th of July, 1868, and the survey of the land, and rested. Defendants showed the several matters above detailed, and also gave evidence tending to show that the ancestor of some of the plaintiffs, in 1808, recognized the partition made between Gregoire Sarpy and Madame Camp of the land within survey 3.217, and that others of the plaintiffs, or their ancestors, in 1831, also made deeds recognizing that partition. By way of rebuttal, plaintiffs showed that the claim presented by Camp and Reilhe to the board of commissioners had been rejected; also that, according to the views entertained by certain government officials of the executive department, the grant made by Morales did not operate to convey a complete title. This was, in substance, all the evidence in the cause. The court gave a number of instructions on both sides and also refused several asked by plaintiffs. It declared: 1. That the act of 4th of July, 1868, was a complete grant, and that the legal representatives—whether heirs, assignees or devisees—of Ann O. Camp and Antoine Reilhe took the land granted by purchase from the United States. 2. It declared the status of plaintiffs as heirs of Camp and Reilhe. 3. That the legal title to the premises remained in the United States until July 4th, 1868; that limitations did not run in favor of defendants, either as applying to the legal or equitable title. 4. That the recorder of land titles had no power to re-examine the claim of Camp and Reilhe if it had been rejected by the board. 5. That the claim was not con-

firmed by the act of 1816. 6. That the fee was in the United States until July 4th, 1868. This declaration had already been made in connection with another—see No. 3. 7. That the grant (called *patent*, in the language of the court,) made by Morales was void, being made after Spain had ceded the territory to France.

On the part of the defendants the court declared the law to be : 1. That if the grant of Morales to Camp and Reilhe was genuine ; if it was laid before the old board and rejected, and afterwards laid before the recorder of land titles; if the land described by it was surveyed by the United States as survey 3,217 ; if this survey was approved June 12th, 1846, and if the claim was confirmed, &c., on July 4th, 1868, then that confirmation inured to the benefit of any person who, after the issuing of the grant, acquired the interest therein of Reilhe or Camp to the extent that such interest was so acquired. 2. If the tract in controversy forms a part of the land so granted; if Antoine Reilhe died February 25th, 1802, leaving a will of which Gregoire Sarpy was appointed executor; and if Sarpy sold the interest of Reilhe as set forth in archive 892, read in evidence, then, in the absence of evidence of actual fraud in Sarpy, such proceeding vested in him the interest and estate of Reilhe in the tract. 3. If the grant by Morales was genuine ; if, after the death of Reilhe, Gregoire Sarpy, his testamentary executor, purchased the interest of Reilhe at a public sale in the manner described in archive 892 ; if, after said purchase, Soulard, the surveyor, made a survey of the tract for the purpose of a partition between Madame Camp and said Sarpy, and made a plat of said survey and sub-division ; if the claim for confirmation of said tract was presented to the old board of commissioners and afterwards to the recorder of land titles; if the tract was surveyed as United States survey 3,217, and confirmed by the act of July 4th, 1868; if the tract in controversy is part of the tract allotted to Gregoire Sarpy on the plat of subdivision made by Soulard, and if the

larger tract mentioned in the deed of Buchanan and wife to Pratte, dated 22nd of January, 1831, is United States survey 3,217, then the law is that said Buchanan and wife admitted that the partition shown by the plat of Soulard was valid and effectual between Ann O. Camp and Gregoire Sarpy, and that said Sarpy had acquired the title to that portion of the original tract belonging to Antoine Reilhe and Stella Buchanan, and the plaintiffs claiming under her are estopped, &c. 4. The deed of Harvey and wife, dated 3rd of January, 1808, to Alexander McNair, is efficient to pass to and vest in said McNair any interest in the land in controversy held by Maria Harvey, daughter of Reilhe. To the giving of these instructions plaintiffs excepted.

The court refused the following instructions or declarations, plaintiffs excepting: 1. The heirs of any deceased person are *prima facie* his legal representatives, and the burden of proof is upon any one disputing their right to represent him. 2. As between strangers in blood, legal representation can subsist only through a valid title, transmitted through mesne conveyances or by devise, and depends for its existence on an assignment of a valid title. Hence this relation cannot subsist between Camp and Reilhe, and strangers to them in blood, unless there was a valid title vested in Camp and Reilhe. 3. The adjudication to Sarpy of the land therein described offered in evidence, if valid, is a quit-claim deed or release of the title of Reilhe or of his estate in the said land; and if no title had ever been vested in Reilhe or in his estate at the time, no inurement of any after-acquired title, if there were such, would take place in favor of Sarpy or his assigns to vest such after-acquired title in them. 4. If there never was any title to the premises in controversy vested in Ann O. Camp and Antoine Reilhe, or their descendants or heirs, whose deeds have been read in evidence, and if plaintiffs, being heirs and legal representatives as such of Camp and Reilhe, have acquired a paramount and

independent title by purchase to said premises, there is no inurement of such title to the grantees or devisees of Camp or Reilhe, or either of them, or the descendants of either of them. 5. The sale to Gregoire Sarpy in 1802 was forbidden by law, and absolutely void. 6. It was also void because there was then no title, legal or equitable, in Reilhe or his heirs. 7. There is no sufficient certainty of the description of the land sold. 8. The deeds of January 22nd, 1831, &c., are incompetent as evidence bearing upon title, because they do not embrace the land in controversy, and are incompetent as evidence of partition because the partition was made after the sale to Sarpy, and because the partition was between Madame Camp and Sarpy, not Madame Camp and Reilhe, &c. 9. The deed from Harvey and wife to McNair, dated January 3rd, 1808, is void for uncertainty of description. 10. Courts are bound to take notice that by the law of Louisiana in 1802 the adjudication to Sarpy was void. 11. The claim of Sarpy and his assigns to the land in controversy is forever barred and void against the plaintiffs claiming under the act of July 4th, 1868, unless it is first shown that he or his assigns filed with the recorder of land titles " a notice in writing, stating the nature and extent of the claim," &c., and that the land so claimed has been confirmed to Sarpy by some act prior to July 4th, 1868. 12. The act of 3rd of March, 1805, and the acts supplementary thereto, required the claimant to deliver to the recorder a notice, &c., and the claim to the land in controversy made by defendant is inadmissible to defeat plaintiffs' action, &c. 13. The adjudication, (archive 892,) not having been filed with the recorder, is forever inadmissible as evidence. 14. If there ever was a valid title in Camp and Reilhe, and if defendants claim the same by mesne conveyances, then by virtue of such conveyances those holding under the same are the legal representatives of Camp and Reilhe, and the burden is on defendants to show that such title was ever vested in

Camp and Reilhe, and, if so vested, it had passed to some persons different from plaintiffs.

We have stated the substance of the instructions without setting out each in the guarded phraseology employed by the learned counsel who framed them, and we will proceed to consider them. We do not, however, intend to go over them *seriatim*. The point of the controversy may be stated, we think, somewhat more briefly than has been done in what precedes; and yet it would hardly have been allowable to abridge the statement made. It is needed for the purpose of rendering the shorter statement completely intelligible.

I. Camp and Reilhe, who were mother-in-law and son-in-law, had obtained a preliminary grant from the Lieutenant-Governor, a survey of the tract, and a formal grant of the same from the Intendant-General. The last document would have been as effectual as a patent from the United States, dated after the 10th of March, 1804, (the day when the flags were changed at St. Louis of the territory of Upper Louisiana,) but for the fact that it was executed after the date of a secret treaty by which Spain ceded the territory to France. We are asked by the counsel for respondents to decide that the grant was valid though executed after the date (1st of October, 1800,) of this treaty, called the treaty of St. Ildefonso, because it was made while Spain continued to be the sovereign *de facto* of the territory, and because the treaty was executory, and never became effective or operative until the 15th of October, 1802, when a Royal order to that end was promulgated at Barcelona. It is not to be denied that there is much force in this view, but we do not think ourselves at liberty to consider it. The qualifications of the title acquired by the United States by the treaty of Paris (April, 1803,) to the territory of Louisiana depend upon the interpretation of a treaty, and the acts of Congress, as well as the decisions of the Supreme Court of the United States interpereting this treaty constitute an authority, which we

will not call into question.   Congres., in the act of the 3rd of March, 1805, and all supplementary acts, has treated the exercise of the disposing power of the government of Spain over the Royal Domain, subsequent to the date of the treaty of San Ildefonso, (1st of October, 1800,) as illegal and inoperative.   The cases of *Foster v. Neilson*, 2 Peters 299 ; *Garcia v. Lee*, 12 Pet. 515 ; *U. S. v. Reynes*, 9 How. 127, and *U. S. v. Lynde*, 11 Wall. 633, are cited by appellants, and fully sustain the position for which they contend. We are of opinion that the grant dated June 19th, 1802, was of no value as a muniment of title.   Whether it was of any importance as evidence that a preliminary and provisional grant by the Lieutenant-Governor and a survey by Soulard had been made of the same land in December, 1796, will be considered presently.

II.   We think that there is evidence in this grant, and still more in the action of the Lieutenant-Governor, before whom were conducted transfers of the land in which such previous grant and survey were recited, that such previous grant and survey had a recognized existence.   We must remember the nature of the government of that day. Transactions of this nature were not numerous, because the inhabitants were very poor and the value of property small.   Every authentic act of transfer was required by law to be witnessed by the commandant of the post, in the absence of a notary.   The office of a notary under the government of Spain was far more important than in our system, and, instead of the number of officers of that name by which modern times are so marked, it is proved by the recitals of nearly every deed executed under the former government that the parties, in the absence and for want of a notary, appeared before the commandant to have their deeds prepared and executed.   This meant that there was no notary in St. Louis at that day, and that the commandant, or some of his staff, drafted the instrument as well as attested it.   The commandant thus became, in some measure, a party to every conveyance of land, and it is well

known that the title to one of the most important tracts of land in the county—namely, the common of Carondelet, embracing nearly 10,000 acres—has for its foundation a remark that fell from the commandant when application was made by another party for a portion of the land within the tract claimed as common; such was the nature of that paternal government. We think we are justified in holding that we have before us evidence tending to prove such a grant and survey in December, 1796, to Camp and Reilhe as are recited in the document dated June 19th, 1802, and in the subsequent proceedings in 1803 in partition.

III. We are of opinion that when Reilhe died in 1802, and Sarpy, his executor, in the same year, in presence of the Lieutenant-Governor and with his concurrence, caused the interest in the tract claimed by Reilhe to be sold, and Sarpy was, with the full and express approval of the Lieutenant-Governor, declared the lawful acquirer of the interest sold, there was a complete resting of the interest of Reilhe in him. The counsel of respondent refer us to the case of *McNair v. Hunt*, 5 Mo. 300, and following, where this very point is determined. And we think the authority of this case conclusive, and in no respect weakened by the later case of *Michoud v. Girod*, 4 How. 503. There the court held the sale to the trustee a nullity because of actual fraud. He had purchased not openly and fairly, but *per interpositam personam*, and the court held this to be an unmistakable badge of fraud. In the case of Sarpy the Lieutenant-Governor, who was in the place of the judge, (the sale is significantly termed an *adjudication*,) knew that Sarpy was the purchaser. It was in his power to permit or disallow him to receive a deed, and to be authentically clothed with the muniments of title. The circumstances showing fairness were sufficiently persuasive. The advantage to the estate of the decedent from permitting him to buy the land was manifest. The property was cried by the public crier, in presence of the commandant, and in a public place, before the fullest possible con-

course of the citizens. When all was done, the com-
mandant, in the most solemn manner, with full information
of the purchase by the executor and guardian, *adjudicated*
the land purchased by him. Nothing was wanting to the
formality of this ratification; and it is almost a waste of
time to show that if this full information that Sarpy was
the purchaser had been withheld from the commandant, if
he had been led to suppose that some stranger was the
purchaser—the fact being that under the stranger's name
Sarpy was concealed—an entirely different case would
have been presented. In that event no possible presumption
of approval or ratification could have been raised, for the
obvious reason that the thing supposed to have been ap-
proved or ratified had never been brought to the notice of
the officer. In the actual case, ratification and approval
are irresistibly inferred, because we see that, with the full
knowledge of a certain fact which would prevent the con-
summation of the transaction if his approval and ratifica-
tion had been withheld, he nevertheless adjudicated the
consummation of the transaction. His approval and
ratification were the condition *sine qua non* of the consum-
mation; and therefore the consummation furnishes an
inevitable presumption that his approval and ratification
were given. It is not doubted that with such approval
and ratification a guardian or other trustee might lawfully
purchase the trust estate, (*McNair v. Hunt,* above cited,)
and that Sarpy, after the completion of what is called the
adjudication, was co-tenant of Madame Camp, in respect of
this land, within the lines of the survey made by Soulard.

IV. We are of opinion that a partition of this tract
was effected in 1803, with all the formalities required by
the civil law, between Madame Camp and Gregoire Sarpy.
We are rather surprised that more reliance was not placed
by the respondents upon the completeness and obligation
of this survey, its commemoration by authentic evidence,
the manifestation of the consent, in writing, to its terms
both by Sarpy and Madame Camp, who appeared by her

attorney, (whom we must consider fully authorized, as he was certainly fully recognized, as such,) and the record of the survey of the partition or subdivision. Upon evidence less formal, and in countries where the statute of frauds furnishes the rule of decision, a partition has been held to be effected which the parties are estopped to deny, and that each co-tenant has a title in severalty by estoppel to his particular allotment. ( *Walker v. Bernard*, N. Car. Conference Reports, Cameron & Norwood, reporters, p. 82; *Mount v. Morton*, 20 Barb. 123; *Wood v. Fleet*, 36 N. Y. 499; *Piatt v. Hubbell*, 5 Ohio 243; *Tomlin v. Hilyard*, 43 Ill. 300; *Gautier v. Howard*, 38 Mo. 68; *Pockman v. Meatt*, 49 Mo. 345.) We could scarcely expect a more formal, regular and well-attested record of a partition. If the authority of Madame Camp's attorney had more fully appeared, or if she had signed the memorandum in person, we cannot think of any formality which the most cautious prudence could have suggested, and which was wanting here. In those days, and until 1816, a conveyance of land, a transfer of title to real estate, could have been made without a writing signed by the proprietor. But such a partition as·was made in 1803, if the single omission above noted were supplied, would be perfectly valid in Missouri at this day. We are, then, of the opinion that such right, title, claim, interest or estate as, prior to 1802, was vested in Madame Camp and Antoine Reilhe as to their tract of 2,905 arpents was, after the execution and return of the memorandum of the partition made between Madame Camp and Sarpy in 1803, vested in Sarpy, in severalty, as to the portion allotted to him, and in Madame Camp, in severalty, as to the portion allotted to her; that is, that Madame Camp and Gregoire Sarpy were the assigns and legal representatives of Madame Camp and Antoine Reilhe as to their respective allotments, according to that partition, of this tract of 2,905 arpents.

V. It is almost needless to add that, so holding, we consider Gregoire Sarpy and his legal representatives the

confirmees, by virtue of the act of July 4th, 1868, of such portion of the tract of 2,905 arpents (U. S. survey 3,217,) as he acquired or was set off to him by this partition. The interest, under Madame Camp and Antoine Reilhe, which he had in this tract was of the same order precisely as the interest which, but for the alienation of it to Sarpy, would have remained in the original grantees or their heirs, and was the meritorious cause of the confirmation precisely as the same interest, if remaining in them, would have been such meritorious cause. An act of confirmation, in the terms used in this act of July 4th, 1868, or a confirmation under the provisions of the act of 1805 and supplementary acts, follows, attaches to and adopts the *status* or estate of the first grantee, without regard to the number of persons through whom it has passed, or the fractions into which it has been divided. It follows the estate, not the person, and whoever is clothed with any portion of this beneficial estate (status—it matters not whether we call it right, title, claim or interest; it is always and everywhere the *status* or *relation* of the owner of the thing, of the original grantee or any of his assigns to the thing granted) is, in respect of that portion, whether divided or undivided, the legal representative of the person named as the original proprietor to whom, or to whose legal representative, the confirmation or grant is made. Whether the person claiming as assignee (or legal representative, otherwise than by descent,) has acquired a right in severalty to a part of the tract, or a right to an undivided interest in the whole tract, is of no consequence, as a moment's reflection will show. The case last supposed hardly, scarcely needs illustration. If the original grantee be A, he may have conveyed an undivided half of it to B and the residue to C, or he may have conveyed one undivided hundredth part of it to B and parceled out the remainder among twenty different persons. It would shock our sense of justice if, under such circumstances, in assumed fulfillment of the obligations of the treaty of

cession, the United States, seeking to do for A what France or Spain would have done before the transfer of the territory, should simply enable A, or the heirs of A, after their ancestor had received, by the sale, the full price and value of the land given to him by the old government, to wrest the thing, for which the price had been paid, from the descendants or grantees of those who paid it, at the end of more than half a century. Either the confirmation or grant inures to the benefit of the original grantee or his heirs, notwithstanding any conveyance made by him or them; or, 2nd, it inures to the benefit of the party holding the *largest* interest in it by sale or inheritance; or, 3rd, it inures to the benefit of all parties who are able to show that they are entitled to stand in the place of the original grantee so far as, and to the extent that, they can show that they are thus entitled. The first of these conclusions is not only opposed to all notions of natural right and justice, but has been repeatedly and pointedly condemned by the decisions of courts to which we are bound to refer even if we should be disposed, if free to challenge them, to criticise their conclusions. Here the concurrence of reason and authority leaves nothing to be said, and we merely refer to the cases of *Landes v. Brant,* 10 How. 348; *Landes v. Perkins,* 12 Mo. 238; *Montgomery v. Sandusky,* 9 Mo. 705; *Byron v. Sarpy,* 18 Mo. 455, among many others that might be cited to the same effect.

The second proposition is obviously untenable. B might hold 51-100 and C 49-100 of the whole tract; should B, in such case, be the sole confirmee? Argument would surely be thrown away on any one who would imagine that the answer to this question could be in the affirmative; and we can hardly conceive that such a person would be shaken by the supposition of B holding 50-100 and C 50-100 of the whole tract, and the difficulty of applying his law to such an hypothesis. The third proposition is, we think, the undeniable result of reason and authority, as well as that to which we are necessarily driven, when

the other two are excluded.    When, instead of the several assignees being clothed with an undivided interest in the whole tract, each has a several right to part of it, the same argument holds.    It would be pedantic and tedious to go over it, making the needful substitutions.  The least industrious reader can do this for himself, and the conclusion is irresistible that each person holding under the original grantee a portion of the whole tract in severalty will, under such an act as that of 1812, that of 1816, that of 1836, or this private act of 1868, hold his individual portion on precisely the same terms with that by which the original grantee or his heirs may hold the remainder of it.    As the evidence showed that the defendants were in possession of part of the land allotted in 1803 to Gregoire Sarpy, and that plaintiffs did not claim under Gregoire Sarpy, our opinion is that there is no error in the record showing that the circuit court gave judgment for the defendants.    We do not entirely concur with the circuit court in all its rulings, but the difference between us consists in our being more strongly than that tribunal in favor of defendants.    We do not think it necessary to analyze in detail each instruction given or refused.    Our views sufficiently appear by what precedes, and, all the judges concurring, the judgment is affirmed.